TERRITORY, respondent, *v.* HART, appellant.

INDICTMENT. — *Members of a grand jury may be brought into court as individuals to testify as to whether twelve of their number concurred in an indictment found.* — In a former appeal of the defendant (*Territory* v. *Hart, ante,* p. 42), the supreme court held that the defendant, upon a motion he had filed for the purpose, should have been allowed to interrogate the members of the grand jury presenting an indictment against him as to whether twelve of their number had concurred therein.   On a retrial, fourteen of the sixteen original members of the said grand jury were brought into court, and the defendant was given an opportunity to examine them, of which he refused to avail himself.   The prosecution then proved by them that the said indictment had been concurred in by twelve of the members of said body.   *Held,* that by bringing into court as individuals members of the said grand jury, and proving by them that twelve of their number had concurred in the indictment, which fact had been put in issue by the defendant's motion, that particular error of the former trial was cured.

*Retrial on the same indictment does not put the defendant in jeopardy a second time.* — *Held,* that the retrial of the defendant did not put him in jeopardy a second time.

ALIEN. — *The naturalization of a criminal juror during a trial removes his disability of alienage.* — During the progress of the trial, the attention of the court was called to the fact that one of the jurors, H., was not a naturalized citizen.   Said H. had come to this country when two years old, with his father, who had been duly naturalized before H. attained his majority.

Thereupon, being afforded the opportunity by the court, said H. was duly naturalized.  *Held,* that the disability of said juror was removed by his naturalization aforesaid.

ID. — *An objection to a juror on the ground of alienage may be waived.* — The record in this case failed to show that any objection to jurors on the ground of alienage had been made.  *Held,* that objection to a juror on the ground of alienage may be waived, either expressly or by failure to object at the proper time.  *Territory* v. *Hart, ante,* p. 42, and *Territory* v. *Harding,* 6 Mont. 326, cited.

*Non-professional witnesses, having an acquaintance with a defendant, and a knowledge of his acts, may testify as to his sanity.* — In this case, defendant pleaded insanity.  Non-professional witnesses were called, who, after stating their acquaintance with him and certain actions of his, and other facts upon which their opinions were founded, were permitted to give their opinion as to his sanity.  *Held,* that the admission of such opinions in evidence was proper.

*A charge to a jury must be considered in toto.* — *Held,* that in the construction of a charge given by a court to a jury, the whole charge must be construed together.  *Kennon* v. *Gilmer,* 5 Mont. 270, and *Territory* v. *Hart, ante,* p. 42, cited.

MURDER. — *An instruction defining the presumption of malice sustained.* — In this case, an instruction given by the court contained the following sentence: "If the life be taken with a deadly weapon, it will be presumed to have been done maliciously and intentionally, as the law presumes every one intends the legitimate result of his action."  *Held,* that in this particular case, even considered independently of the other portions of the charge, the said sentence states a correct proposition of law.

ID. — *When a defendant cannot object that an instruction as to his character for peace is not full enough or sufficient.* — The defendent objected to, as not being full enough or sufficient, that certain portion of an instruction which read as follows: "The defendant has introduced his character for peace.  This stands as a witness for him, to be given its due weight with all the other evidence."  *Held,* that if the defendant had desired any more explicit charge on this point, it was his duty to have asked it.

CRIMINAL TRIAL. — *A temporary separation of a jury is not of itself a sufficient ground to grant a new trial.* — One of the grounds for which a new trial may be granted in a criminal case, as set forth in subdivision 2, section 254, division 3, Compiled Statutes of Montana, is as follows: "When the jury has been separated without leave of the court, or has been guilty of any misconduct, tending to prevent a fair and due consideration of the case."  In this case, prior to retiring for consideration of their verdict, the court permitted the jury to go in charge of an officer to a hotel for supper.  They went to the wash-room, and two of their number returned to the office before the others, and engaged in conversation with several persons for a few minutes.  Nothing was said in reference to the case, and the separation of the two from their fellows was only for a few feet, and the entire jury was at all times in charge of the bailiff.  *Held,* that such a separation was not a sufficient ground for a new trial under the statute.

ID. — *Several of the jurors, during the consideration of the verdict, took drinks of spirituous liquors, and no new trial was granted.* — On two occasions while the jury had the case under consideration and were in charge of a bailiff, at hotels for their meals, several of them drank spirituous liquors at hotel bars. They did not take on these occasions more than one drink each, and no intoxication was produced. *Held*, that such drinking did not constitute misconduct sufficient to justify the granting of a new trial.

*Appeal from District Court, Lewis and Clarke County.*

CAMPBELL & DUFFY, and J. E. CARNE, for the appellant.

It is error for the court to charge that the use of a deadly weapon, not in necessary self-defense, whereby death ensues, will constitute murder. *Donnellan v. Commonwealth,* 7 Bush, 676. Also, to charge that if homicide be committed by a deadly weapon, in the previous possession of the accused, the law implies malice. *Smith v. Commonwealth,* 1 Duvall, 224. And the error is not cured by giving a correct instruction at the request of either party. *Clem v. State,* 31 Ind. 480; *Bradley v. State,* 31 Ind. 492. Instruction of the court as to the character of the defendant was not full enough. The court erred in overruling defendant's motion for a new trial upon the facts showing a separation of the jury. *Russell v. People,* 44 Ill. 508; *Jumpertz v. People,* 21 Ill. 411; *State v. Williamson,* 42 Conn. 261; *State v. Parrant,* 16 Minn. 178; *Cantwell v. State,* 18 Ohio St. 477; *Warren v. State,* 9 Tex. App. 619; *Soria v. State,* 2 Tex. App. 297. The rule of the common law was to permit no separation of the jury, in felonies, after they had been charged. 1 Coke on Littleton, 227 b. The provisions of our national and state constitutions guaranteeing the right of trial by jury, preserve that right as it existed at common law. *Williams v. State,* 45 Ala. 57; *People v. Reagle,* 60 Barb. 529; *State v. Cucuel,* 31 N. J. L. 252. Where a separation is shown to have occurred, it is immaterial to inquire whether improper influences were exerted upon

the jury, or not. *Woods* v. *State*, 43 Miss. 364; *Boles* v. *State*, 13 Smedes & M. 398; *Hare* v. *State*, 4 How. (Miss.) 187; *Daniel* v. *State*, 56 Ga. 653; *Maher* v. *State*, 3 Minn. 444; *Overbee* v. *Commonwealth*, 1 Rob. (Va.) 756. As to the indulgence by several members of the jury in spirit-uous liquors being a sufficient ground for the granting of a new trial in this case, see *People* v. *Gray*, 65 Cal. 183; *State* v. *Baldy*, 17 Iowa, 39; *Ryan* v. *Harrow*, 27 Iowa, 494; *Davis* v. *State*, 35 Ind. 496; *Leighton* v. *Sargent*, 31 N. H. 119; *State* v. *Bullard*, 16 N. H. 139; *Pelham* v. *Page*, 6 Ark. 535; *Greg* v. *McDaniel*, 4 How. 367.

W. E. CULLEN, Attorney-General, for the respondent.

As to the point raised, that the grand jury who had found the indictment against the defendant should have been brought into court as an official body, to be examined by the defendant as to whether twelve of their number had concurred in the indictment, see *Commonwealth* v. *Smith*, 9 Mass. 107. The opinion of a physician as to the cause of death is competent. *State* v. *Powell*, 7 N. J. L. 249; *Shelton* v. *State*, 34 Tex. 664; *State* v. *Morphy*, 33 Iowa, 273; *Curry* v. *State*, 5 Neb. 417; *State* v *Smith*, 32 Me. 370. The physical or mental condition of a person, or his manner, habits, or conduct, may be proved by ordinary witnesses. Such is the rule in all the states except Maine, Massachusetts, New Hampshire, and Texas. Lawson on Expert and Opinion Evidence, p. 476, and cases there cited. Appellant selects a single sentence from the charge of the court, — that defining the presumption of malice, — and claims that it was erroneous. Said sentence, however, taken in connection with the context of the charge, correctly states the law. No harm resulted to the defendant from the separation of the jury, and a new trial should not be granted for such separation. *People* v. *Kelly*, 46 Cal. 356; *State* v. *Turner*, 25 La. Ann. 573. No harm resulted to

the defendant from several of the jurors taking drinks of spirituous liquors. None of them became in the slightest degree intoxicated. A new trial cannot be granted, therefore, for that reason. See *Wilson* v. *Abrahams,* 1 Hill, 207; *Jones* v. *State,* 13 Tex. 168; *State* v. *Sparrow,* 3 Murph. 487; *Pope* v. *State,* 36 Miss. 121; *Commonwealth* v. *Thompson,* 8 Gratt. 637; *Stone* v. *State,* 4 Humph. 27; *Rowe* v. *Smith,* 11 Humph. 491; *State* v. *Caulfield,* 23 La. Ann. 146; *Davis* v. *People,* 19 Ill. 74; *State* v. *Jones,* 7 Nev. 408. Massachusetts and New Hampshire hold that the drinking of any intoxicating liquor will set aside a verdict. But see *Gilmanton* v. *Ham,* 38 N. H. 108. Iowa, Indiana, and Ohio adhere to the more rigid rule also. The weight of authority, however, is in favor of the rule laid down by Judge Bronson in the New York case of *Wilson* v. *Abrahams,* 1 Hill, 207, cited above.

McLEARY, J. The appellant in this case stands charged with the crime of murder in the first degree, for the killing of John W. Pitts, which occurred at the town of Boulder, in Jefferson County, Montana, on the seventh day of November, 1885. Indictment was found on the fourth day of May, 1886, by a grand jury of said county. The case came on for trial at the October term, 1886, of the district court of Jefferson County, which resulted in a mistrial, the jury failing to agree. The case was afterwards tried by the said court on the seventh day of May, 1887, and the defendant was convicted, and sentenced to death. From this conviction he appealed to this court at the July term, 1887, when the case was reversed and remanded for errors occurring on the trial in the court below. *Territory* v. *Hart, ante,* p. 42. On the filing of the *remittitur* at the ensuing term of the court in Jefferson County, a change of venue was ordered to the county of Lewis and Clarke, where the case was tried again on the 22d of November, 1887, and the defendant was again

convicted, and sentenced to the death penalty, from which conviction he now prosecutes this appeal. Several errors alleged to have been committed by the court below are relied upon for the reversal of this judgment, and they will be noticed in their order as presented in the brief.

1. The first ground of alleged error is, that the court had no authority to compel the defendant to examine the members of the grand jury who found the indictment against him as to whether or not twelve of their number had concurred in finding such indictment. No such action on the part of the court is apparent from the record. No compulsion was used towards the defendant in the matter of the examination of the grand jurors. This court having held on the former appeal that the indorsement on the indictment was only *prima fácie* evidence that the requisite number of grand jurors had concurred in finding the bill, and the appellant having on the former trial, by motion properly made, called into question the *prima facie* case made by the indorsement on the indictment, fourteen of the sixteen persons who composed the grand jury were brought into court, and the defendant was offered an opportunity of taking their testimony upon the matter put in issue by this motion. He declined to interrogate them, and thereupon, under direction of the court, they were examined by the prosecuting attorney, and each and every one answered that twelve of their number had concurred in the finding of the indictment. This court, on the former appeal, in regard to this question, uses the following language: "We are, then, after careful consideration and mature deliberation, of the opinion that the bringing into court of the indictment properly indorsed, and the filing of the same by the clerk in the presence of the grand jury, are only *prima facie* evidence of the concurrence of twelve or more of the grand jurors in the indictment, and that

the accused has the right, before pleading thereto, on a motion to vacate the same properly made, as in this case, to require the individual grand jurors to be interrogated under oath as to whether or not twelve or more of their number concurred in finding the indictment." *Territory* v. *Hart, ante,* p. 42. The defendant's counsel seems to misapprehend this language of the court, and to construe it to mean that the grand jury, as a body, must be brought into court in their official capacity, and before they are discharged, to be interrogated by the defendant as to the matter under consideration. Such is not the meaning of the language used. The defendant has the right to require the individual grand jurors to be examined as witnesses to testify to the fact as to whether or not twelve of their number concurred in finding the indictment, and he cannot complain that the court, by its authority, caused them to be brought forward for his benefit. These persons were not in court as a grand jury, nor as grand jurors, but as individuals, in the capacity of witnesses, by one or more of whom the defendant was at liberty to prove that twelve members of the grand jury had not concurred in finding the indictment against him. He had the right to interrogate them, but declined to do so, and he cannot complain of the action of the court in this respect. Neither can he complain that the entire number of persons composing the grand jury were not present. The matter put in issue by his motion was a question of fact, which might have been proved by any one or more of the persons who composed the grand jury; and until such evidence should have been rebutted, it would have been as effective in regard to this matter as the cumulative evidence of the whole sixteen persons. The fact that one of the grand jurors was dead, and another had left the territory, was ample excuse, if any were necessary, why the whole sixteen persons were not examined. There is no error of

the court upon this point, and it clearly appearing, by the evidence introduced by the prosecution, that twelve of the grand jury had concurred in finding the indictment, the defendant's motion in regard thereto falls to the ground, and requires no further consideration.

2. The position taken, that the defendant was put in jeopardy for the second time by this trial in the court below, is abandoned by his counsel on the argument in this court. It could not have been maintained if it had been insisted on, and needs no further consideration.

3. The next error assigned in the brief is the alleged alienage of the trial jurors Horsky and Steinbrenner. The record shows that Horsky arrived in this country during his childhood, and his father was duly naturalized before this juror attained his majority. It also appears from the transcript that Steinbrenner was a naturalized citizen at the time he was impaneled on the trial jury. During the progress of the trial (it does not appear at what particular stage) counsel for defendant called the attention of the court to the fact that there were one or more persons on the jury who were not citizens of the United States. On examination, it appeared that the juror Horsky had come to America with his father when he was about two years old, and had been in this country thirty-two years, and had never taken out his naturalization papers. Thereupon, being afforded an opportunity by the court, he was naturalized in the proper form, and the trial proceeded. It then appears that at the time the jury retired to consider their verdict, and at the time the verdict was rendered, all the members of the jury were citizens of the United States, and the objection of alienage does not apply. But even if there had been aliens upon the jury, the record does not show that the objection was made by the defendant at the proper time. Upon the former appeal in this case the court used the following language: "The juror Doniothy, who was chal-

lenged on account of alienage, was permitted by the defendant to sit in this case, through a failure to exercise his right of peremptory challenge, the accused having two peremptory challenges unexhausted when he accepted the jury. He thereby waived the objection of alienage, if it were otherwise a good objection, and there was no error of which he could properly complain. It has been repeatedly decided that alienage is a disqualification of a juror which the defendant may waive, either expressly or by failure to object at the proper time." *Territory* v. *Hart, ante*, p. 42. This position was held by the court after thorough investigation and long consideration of the authorities. *Territory* v. *Harding*, 6 Mont. 326; *Lum* v. *State*, 11 Tex. 483; *Presbury* v. *Commonwealth*, 9 Dana, 203; *State* v. *Elliott*, 45 Iowa, 487; *Benton* v. *State*, 30 Ark. 340–344; *Erwin* v. *State*, 29 Ohio St. 190; *People* v. *McGungill*, 41 Cal. 430.

4. The next three objections urged by counsel in his brief relate to the admission of certain testimony which was claimed to be incompetent, but they were abandoned in the argument, and require no further notice.

5. The seventh assignment of error made by appellant is, that the opinions of certain witnesses who were not medical experts were permitted to be given in evidence to the jury upon the trial of this case. It appears, from the transcript, that non-professional witnesses were examined on the part of the defendant, and after stating their acquaintance with him, and certain actions of his, and other facts upon which their opinions were founded, were permitted to give their opinions as to his sanity. After that, other non-professional witnesses were called in rebuttal by the prosecution, and examined as to their acquaintance with the defendant, and testified as to his different acts, habits, and manners, as the same had fallen under their observation, and were thereupon questioned as to their opinions in regard to his sanity; to the

giving of which opinions in evidence the defendant, by his counsel, objected. We will disregard the fact that the evidence objected to was given in rebuttal, and treat it in the same manner as if it had been offered in proving the case on the part of the prosecution before the defendant was permitted to introduce his evidence.

The question, then, presented by the record is, whether or not non-professional witnesses, who are acquainted with the defendant, and have observed his actions and manner of life, may give in evidence their opinions as to his sanity or insanity on a trial for murder. It is certainly one of the fundamental rules of evidence that witnesses are required to testify as to facts, and not allowed to give their individual opinions to the jury. And this rule must always be followed when the facts can be sufficiently and properly detailed, and the circumstances described in such a manner that the jury are able to form correct conclusions for themselves, unaided by the opinion, impressions, or judgment of the witness. But there many cases in which the line between facts and opinions is not very definitely drawn. It is often almost impossible for a witness of ordinary intelligence to state the facts and circumstances of a case, or any particular transaction, to a jury, without indicating his own opinions in regard thereto, and very few persons have sufficient descriptive powers to state any particular matter which has passed under their observation, before a jury, in a perfectly correct light, without intimating the impression that it produced upon their minds at the time, in the shape of an opinion more or less fixed. There are certain cases in which nothing but the opinion .of the witness will give to the jury a due appreciation of the result of his observations. Judge Doe, of New Hampshire, gives a very excellent illustration of this in the following language: " In criminal cases, it is often a question how nearly a foot-print in

earth or snow corresponded to the form of a shoe of the prisoner. A witness who has seen the foot-print and the shoe is allowed to give his opinion on the subject, because a mere description of forms would not be the best evidence. If a plaster cast of the track, or the original impression itself, preserved by freezing, could be produced, this evidence of its form would be more satisfactory than any verbal description. So it is when an impression has been made upon the mind of a witness by the appearance and conduct of the prisoner indicating sanity or insanity; that impression is the best evidence the witness can give on the subject. His description of the appearance and conduct is, in fact, but indirect and imperfect evidence of the impression. When he gives the original impression itself, it is as if the foot-print were brought into court." Lawson on Expert Evidence, 493. Testimony in regard to sanity or insanity forms one of the most noted exceptions to the general rule which we have have heretofore adverted to. Whatever may have been the rule in former times, it can no longer be regarded as doubtful that " one not an expert may give an opinion, founded upon observation, that a certain person is sane or insane." Lawson on Expert Evidence, 476, subrule 4. It appears that this has been the generally received doctrine in the English courts, and it is said to have been received without debate in the courts of all the states except those of Massachusetts, Maine, New Hampshire, and Texas. The contrary doctrine has been greatly modified in Massachusetts, as an examination of the cases in that state will show. *Barker* v. *Comins*, 110 Mass. 477; *Nash* v. *Hunt*, 116 Mass. 237; *Commonwealth* v. *Pomeroy*, 117 Mass. 143. In New Hampshire, the rule announced had a long struggle for supremacy. It was first enunciated by Judge Doe in an able dissenting opinion in the case of *State* v. *Pike*, 49 N. H. 401. However, the

supreme court of that state, in the case of *State* v. *Jones*, 50 N. H. 369, and *State* v. *Archer*, 54 N. H. 468, adhered to the original proposition announced in the case of *Hamblett* v. *Hamblett*, 6 N. H. 333, and *Boardman* v. *Woodman*, 37 N. H. 133, and disregarded the dissenting opinion of Judge Doe. However, in the case of *Hardy* v. *Merrill*, 56 N. H. 227, Chief Justice Foster, in a very lengthy and able opinion, reviews all the decisions, and coincides with the general American doctrine announced in the rule above quoted. Thus we see that Judge Doe's dissenting opinion finally became the recognized rule of law in New Hampshire. What may be the current of opinion at the present time in the state of Maine, we have not had leisure to examine. The court of appeals of Texas has overruled the doctrine announced in *Gehrke* v. *State*, 13 Tex. 572, and now coincides with the general rule laid down by Lawson. Judge White, in a very able opinion, used the following language: "Whatever may have been the rules of evidence heretofore with regard to the character of proof admissible on the subject of insanity, the doctrine that non-professional witnesses should be allowed to state their opinion as to the sanity of the party, derived from their acquaintance with and observation of his conduct, appearance, and actions, has become too well settled to admit of doubt or controversy at this time. *Holcomb* v. *State*, 41 Tex. 125; *McClackey* v. *State*, 5 Tex. App. 320. We are aware that in *Gehrke* v. *State* our supreme court, following in the wake of the decisions in Massachusetts and New Hampshire, held otherwise. 13 Tex. 568. The subject has, however, of late years been more thoroughly examined and discussed; and in New Hampshire particularly, in the recent case of *Hardy* v. *Merrill*, Foster, C. J., in a most elaborate opinion, concurred in by the supreme court, reviews the previous decisions, and overrules them, which places that court in full accord with the English

and American doctrine as it now generally obtains on that subject. 56 N. H. 227. The case of *Gehrke* v. *State,* 13 Tex. 568, has been practically, as we have seen, and will be hereafter considered as, overruled on this point." *Webb* v. *State,* 5 Tex. App. 608, 609. The rule has also been reaffirmed in the case of *Mendiola* v. *State,* 18 Tex. App. 466. The question is discussed to some extent in 1 Whart. Ev., sec. 451; but it is treated with more fullness and ability, perhaps, in Mr. Lawson's work, to which reference has been made, than in any other book to which we have had access. There can be no doubt that the ruling of the court below in the admission of the testimony objected to by the defendant was correct.

6. The next alleged error complained of by the appellant is in the charge of the court. The following paragraph is selected and claimed to be erroneous, to wit: " If the life be taken with a deadly weapon, it will be presumed to have been done maliciously and intentionally, as the law presumes every one to intend the legitimate result of his action." In order to properly understand the language of the charge objected to, it is necessary to quote the whole paragraph in which it occurs, which reads as follows: " The first proposition for you to consider is, Was the deceased killed in the manner set out in the indictment, and in the county of Jefferson, territory of Montana, before the finding of this indictment? This is called the *corpus delicti,* or body of the offense, and must first be established. This being done, your next inquiry will be, Did the defendant do the killing? If he did, was it done with deliberation, premeditation, malice aforethought, and willfully? If so, he is guilty as charged in the indictment, provided he was a person at the time legally responsible for his action. It is always essential to both grades of murder—the first and second degrees—that malice aforethought shall exist. If all four of the ingredients

of willfulness, deliberation, premeditation, and malice aforethought exist, it is murder in the first degree; but if any one of them be wanting, except malice aforethought, it is murder in the second degree.    Malice means, in law, as already stated, that deliberate intention unlawfully to take the life of a fellow-creature, or to do him some harm, without provocation, and without legal excuse or justification.    If a person, from a wicked and depraved heart, inflicts a mortal wound upon another, this is said to be done in malice, the term ' malice ' having reference to that wicked and depraved spirit which prompts the taking of life, rather than to any grudge, or ill will, or hatred towards the deceased.    Nevertheless, if such grudge, hatred, or ill will exists, and is the moving cause of the killing, it is equally malice.    If the life be taken with a deadly weapon, it will be presumed to have been done maliciously and intentionally, as the law presumes every one to intend the legitimate result of his action.    But it is always a question for you to determine, from all the circumstances surrounding the case, whether it is done maliciously and willfully."    It is a fundamental principle in the construction of all instruments, more especially of a charge given by a court to a jury, that the whole charge must be construed together.    ·A judge is not supposed to give all the law to a jury in one paragraph, or in one sentence.    If, then, the whole charge taken together presents the law applicable to the facts of the case correctly, without contradiction or material omission, it must be held, for all practicable purposes, to be correct.    *Kennon* v. *Gilmer,* 5 Mont. 270, 271; *Territory* v. *Hart, ante,* p. 42; *People* v. *Doyell,* 48 Cal. 93; Thompson on Charging the Jury, p. 75, sec. 48.    Some authorities are cited by the appellant to sustain his objection to the portion of the charge above quoted.    We will notice them briefly.    In the case of *Clem* v. *State,* 31 Ind. 484, the court criticises a charge which is copied

from 1 Greenl. Ev., sec. 18, and reads as follows: "Every sane man is conclusively presumed to contemplate the natural and probable consequences of his own acts, and therefore the intent to murder is conclusively inferred from the deliberate use of a deadly weapon." This, the court says, is entirely at variance with the principles which have received the uniform sanction of all the courts in this country and Great Britain, and is not sustained by the authorities which the writer cites in its support." We do not deny the correctness of the opinion rendered by the supreme court of Indiana, but the charge given in the Clem case differs very materially from the one given in the case at bar. The court below did not say that "the intent to murder is conclusively inferred from the deliberate use of a deadly weapon," but only said that, "if life be taken with a deadly weapon, it will be presumed to be done maliciously and intentionally,"—which is a very different proposition.

Again, a case is cited from the supreme court of Kentucky, in which occurs the following language: "The court instructed the jury, that 'if homicide be committed by a deadly weapon in the previous possession of the slayer, the law implies malice in the perpetrator.' As given without qualification as to how or for what purpose the weapon happened in the perpetrator's possession, or whether, having it for a lawful purpose, he used it in self-defense, or under sudden and provoked heat of passion, this instruction was certainly wrong and misleading." *Smith* v. *Commonwealth,* 1 Duvall, 226. It will be seen that the charge given by the trial court in Kentucky is similar to the one given in the case at bar, but the difference is, that in the Smith case the charge was given without qualification, and in the case at bar it was given as an integral part of a lengthy instruction defining and illustrating the legal signification of the term "malice." Again, the supreme court of Kentucky in tl e

cace of *Donnellan* v. *Commonwealth*, 7 Bush, 679, expresses
its opinion as follows: "The instruction to the effect that,
in any case, the use of a deadly weapon, not in necessary
self-defense, whereby death ensues, will constitute mur-
der, was also erroneous. Such use of a deadly weapon
is evidence of malice, and may be an essential ingredient
in the proof of murder in many cases; but it does not
follow that every homicide committed by the use of
a deadly weapon, and not in necessary self-defense, is
murder." This charge seems to have, been copied from
Greenleaf in the same manner as in the Clem case, and
of course is equally erroneous. But the comments of the
court, as quoted above, show the charge which was given
by the court below in the case now under consideration
to have been correct and proper. The use of a· deadly
weapon is, when unexplained by other testimony, or un-
attended by circumstances of justification or excuse, evi-
dence of malice, and that is all that the charge of the
court in this case amounted to. But the appellant cites
the case of *Bradley* v. *State*, 31 Ind. 504, to support the
proposition that if an error is committed in one part of
charge, it is not cured by giving a correct instructien at
the request of the defendant or the prosecution. An
error in one instruction would certainly not be cured by
giving a contradictory instruction, but a portion of a
charge, which, standing alone and unexplained, might be
erroneous, may, when taken in connection with other
portions of the charge explaining or illustrating or en-
larging the proposition announced, be practically cor-
rect. Cases cited *supra*. But in this particular case, the
proposition taken independently, and unconnected with
any other portion of the charge, is a correct proposition
of law, and is presumed to be applicable to the facts
proved on the trial. So that we cannot hold, in any
point of view, that the charge given below and com-
plained of by the appellant was erroneous.

7. Another charge of the court on the question of character is complained of as erroneous, " in this, that it was not full enough or sufficient." The portion of the charge complained of in this respect reads as follows: " The defendant has introduced his character for peace. This stands as a witness for him, to be given its due weight with all the other evidence." If the appellant desired any more explicit charge on this point, it was his duty to have asked it; and not having done so in the court below, he cannot be heard to complain in this court. If there is anything objectionable in the able charge of the court below, taken as a whole, it is that it is too favorable to the accused on the question of insanity, which was his principal, if not his only, defense.

8. The next alleged error complained of by the appellant is the refusal of the court to grant a new trial on account of the separation of the jury, without the consent of the court, during the trial of the cause. This is one of the grounds for which a new trial may be granted under the terms of section 354, division 3, Compiled Statutes of Montana, which reads as follows: " When the jury have been separated without leave of the court, or have been guilty of any misconduct tending to prevent a fair and due consideration of the case." Comp. Stats. Mont., div. 3, sec. 354, par. 2, p. 468. The facts in regard to the alleged separation are about as follows: Prior to retiring for the purpose of considering of their verdict, the court permitted the jury to go, in charge of an officer, to the Cosmopolitan Hotel for the purpose of taking their supper. When they reached the hotel, they went into the wash-room, and two of their number appear to have returned to the hotel office before the others, and thus a partial and temporary separation of a few feet took place. The entire jury was at all times in charge of the officer, and it appears that no one conversed with them during the time, except that some

casual remarks were made to them by the counsel for
the appellant and two other persons, which had no rela-
tion to the case. The separation lasted, one of the
jurors says, probably half a minute; certainly, from the
evidence of all the parties, not more than five minutes.
Is this such a separation as is contemplated by the stat-
ute? It is, of course, of the greatest importance that
the jury should be kept together, in accordance with the
spirit as well as with the letter of the law; and if one
bailiff cannot succeed in keeping them from separating,
two should be employed for that purpose. And in a
capital case, none but experienced and competent men
should be allowed to be placed in charge of a jury. But
it is not every casual or partial separation of the jury
that will be sufficient ground for granting a new trial.
In a California case, the court uses the following lan-
guage: "The facts that the jury, after they retired for
deliberation, were conducted by the officer having them
in charge to the dining-room of a hotel, where they re-
mained together for three quarters of an hour; that one
of the doors of the room was open and accessible to
strangers; and that the officer in charge was absent
from the room for a few minutes during the period
named,— are insufficient to constitute misconduct on
the part of the jury, or of the officer, for which a new
trial should be granted. The fact that any person en-
tered the room and conversed with any of the jurors is
emphatically denied by counter-affidavits; but if it were
not, a few mere passing remarks between the jurors and
strangers would not furnish ground for a new trial."
*People* v. *Kelly*, 46 Cal. 357. The supreme court of
Louisiana, in a well-considered case, announces the law
as follows: "We will not say that because a juror was
for a moment out of the presence of the officer under
whose charge he was, when it is not shown or alleged
that he had any communication with any other person,

and it does not appear that he had any opportunity to have had any, it necessarily establishes the presumption of misconduct, and makes it obligatory upon us to set aside the verdict." *State* v. *Turner*, 25 La. Ann. 574.

We are referred by counsel for appellant to the case of *Soria* v. *State*, 2 Tex. App. 299, in support of his position upon this alleged error. In that case a juror separated himself from his fellows, for a necessary purpose, about 150 yards. Still, Judge Winkler, delivering the opinion of the court, says: " In this instance, however, it seems that the spirit of the law was not violated by the temporary withdrawal of the juror, for the reason that, during the time, he was under the view of the bailiff of the jury"; and the case was affirmed. In a subsequent case, the court of appeals of Texas, in commenting on the decision in *Jones* v. *State*, 13 Tex. 168, says: " In other subsequent decisions our supreme court have held substantially that something more than separation, or that one or more of the jurors were seen apart, or standing near outside persons, is required to affect the fairness of a verdict. It must affirmatively appear that there was such misconduct that showed a fair trial was not had," — citing numerous authorities from the supreme court of that state. *Davis* v. *State*, 3 Tex. App. 101, 102. Again, the same court in a later case uses the following language: " Our supreme court in a number of cases have held that something more than separation of the jury, such as is forbidden by the code, is required to affect the fairness of a verdict; that it must affirmatively appear that there was some reason to suppose that wrong or injustice might have resulted from it to the appellant. And the same rule has been followed by this court." *Cox* v. *State*, 7 Tex. App. 4. Again, the supreme court, in the case of *West* v. *State*, 7 Tex. App. 159, affirms the rule in *Davis* v. *State*, *supra*, that the separation of the jury before bringing in a verdict in a

felony case does not *per se* render the verdict void, but
such verdict will be set aside or not, according to the
circumstances.   Again, in a later case, Judge Hurt, de-
livering the opinion of the same court, says: "There
can be but two reasons why a verdict should be set aside
when a separation of the jury has taken place: 1. That
the jury have been tampered with; or 2. Might have
been tampered with.   Here the record precludes any
such supposition."   *Russell* v. *State,* 11 Tex. App. 296.
Finally, it would seem that this question was set at rest,
in Texas at least, by a decision in which the court, re-
ferring to the previous cases, says: "The mere separa-
tion of a jury is not cause for a new trial.   In addition
to the separation in contravention of the law, it must be
further made to appear that by reason of such separa-
tion probable injustice to the accused has been occa-
sioned."   In this case a juror was taken sick during the
trial, and was separated from the other jurors for about
twelve hours during the night, but remained in charge
of a deputy sheriff, and was not spoken to by any one
about the case, and heard no conversation in regard to
the same.   *Ogle* v. *State,* 16 Tex. App. 368.   We have
been thus careful to review the Texas cases, not only on
account of the high character of the court of appeals of
that state, but because the appellant seems to rely upon
the decisions of the courts of that state, and for the rea-
son that the Texas statute is more strict upon this point
of the separation of the jury even than our own.   Gra-
ham and Waterman lay down the following rule: "It is
now well settled, without regard to the nature of the
trial, that the separation of the jury, even though unau-
thorized by the court, where no injury has ensued, will
not be a ground for setting aside the verdict."   2 Gra-
ham and Waterman on New Trials, 502.   Numerous
cases are cited and quoted from to sustain this proposi-
tion.   It is not necessary for us to review all the cases

discussed in the text-books, or to proceed further in the consideration of this alleged error. No injury to the appellant is apparent from the record. In fact, it appears, on the contrary, that he was not prejudiced thereby, and for that reason, under the rule quoted, which meets our approval, it is clearly considered that the court below acted properly in refusing to grant a new trial on this ground.

9. The last error complained of by the appellant is the refusal of the court to grant a new trial on account of the alleged misconduct of the jury in drinking spirituous liquors while they had the case under consideration. It appears from the record, that on two occasions while the jury were in charge of the bailiff, and visiting the hotels for the purpose of taking their meals, some of the jurors drank at the hotel bar at their own expense. It does not appear that they took more than one drink each on either of these occasions, or that any one of them was in the least intoxicated thereby. The drinking of spirituous liquors by the jurors after they have been impaneled, especially in a capital case, is worthy of the severest censure, and it should always be punished by an appropriate fine. When the property, the liberty, and even the life of their fellow-man rests in the hands of jurors, they cannot be too careful in keeping their heads cool, and their hearts uninflamed by prejudice and passion. On no account ought they to do anything which could pervert their judgment or arouse their passions. But in modern times the ancient common-law rule of keeping the jury from "meat and drink, fire and candle," until they have agreed, has been in all the states of America relaxed. And if the jury are permitted to take their dinners, there seems to be no more reason why they should be prohibited from drinking light wines in moderation, at such meals, than there would be in depriving them of coffee or tea. But if the jurors, or any one of

them, has so indulged in the use of intoxicating liquor
as to be influenced thereby in arriving at his verdict, a
new trial should be awarded.  It is said that the modern
rule is to set aside the "verdict only when the irregularity
may have had an influence on the final result."  2 Gra-
ham and Waterman on New Trials, 504.  The question of
drinking spirituous liquors by the jury is one which has
been discussed and decided on numerous occasions by
nearly every court of last resort in the United States.
We could not attempt a complete review of all the cases
upon this point; neither is it necessary so to do.  We
cannot agree with the doctrine announced in certain
cases in Kansas, Iowa, and Arkansas, that a verdict ren-
dered by a drunken jury, or a jury one or more of whose
members were during the trial intoxicated, should be, in
any case, allowed to stand.  *State* v. *Tatlow*, 34 Kan. 84;
*State* v. *Livingston*, 64 Iowa, 560; *Pelham* v. *Page*, 6 Ark.
535.   In an early case in Texas, in a very able opinion
delivered by Judge Lipscomb, the supreme court reviews
the cases theretofore decided, and holds· that drinking
whisky is ground for reversal.  *Jones* v. *State*, 13 Tex.
App. 182.   However, this rule is no longer in force in
that state.   The court of appeals of Texas in 1885 virtu-
ally overrules the case of *Jones* v. *State, supra*, and holds
the following: " It was very reprehensible for the jury to
send for and obtain whisky, and drink the same, during
their deliberation upon the case, and such conduct
should always be visited with punishment to those
guilty of it.   But no such immoderate use of intoxicat-
ing liquor is shown to have existed in this case as would,
in the absence of circumstances tending to show that it
had influenced the verdict of the jury, warrant the set-
ting aside of the verdict."  *Allen* v. *State*, 7 Tex. App,
298.  In this respect the rule announced by Graham and
Waterman, and approved by the cases quoted from above,
has been affirmed in numerous decisions, some of which

only will be referred to. *Davis* v. *People,* 19 Ill. 77; *State* v. *Caulfield,* 23 La. Ann. 149; *Tuttle* v. *State,* 6 Tex. App. 561; *Wilson* v. *Abrahams,* 1 Hill, 211. From the facts shown by the record, it does not not appear that any of the jurors were in the least intoxicated, or that the cause of the defendant was in any manner prejudiced by their indulgence in spirituous liquors. For this reason, under the rule announced, there was no error in the action of the court below in refusing a new trial on this ground.

10. The attorney-general closes his brief with this exhortation to the court: "The appellant in this case, as appears by the record, shot a man to death in open daylight, in the court-house at Jefferson County, in the presence of one or more eye-witnesses. He has had three impartial trials, and been twice convicted of murder in the first degree. The people ought not to be put to further expense in his case unless error has most clearly and manifestly intervened." Both of these appeals being on matters of law only, there is not now, and was not on the former appeal, any statement of the evidence from which this court could know the circumstances of this homicide. And even if it had transpired in the manner detailed by counsel *dehors* the record, still there may have been, beyond the facts stated, circumstances of excuse, or even of justification. In the first trial, there was a disagreement of the jury, and in the second, one of the prisoner's plain, statutory rights was, inadvertently of course, disregarded by the court. The third trial is now under review; and we take occasion to say that no man, however poor and friendless, should ever be permitted to suffer the death penalty, except after a fair public trial by an impartial jury of his countrymen. A strict compliance with all the forms of law, and a due regard to every constitutional or statutory right guaranteed to the prisoner, is essential to the preser-

vation of the liberty of every citizen of the United States.
If the legal forms can be disregarded in the case of any
man who has, by even the most atrocious crime, in-
curred the popular displeasure, they may likewise be put
aside in the case of some other person who is perhaps
innocent of the crime of which he is accused.   The
forms of law in criminal trials are the bulwarks of human
liberty, and any court which would intentionally disre-
gard them, in obedience to a popular clamor for blood
and vengeance, is unworthy of the high trust committed
to its keeping.   We cannot better answer all such sugges-
tions than by a quotation from that great legal philoso-
pher and sage, Montesquieu, who says: "We hear it
generally said that justice ought to be administered with
us as in Turkey.  Is it possible, then, that the most igno-
rant of all nations should be the most clear-sighted in a
point which it most behooves mankind to know?   If we
examine the set forms of justice with respect to the
trouble the subject undergoes in recovering his property,
or in obtaining satisfaction for an injury or affront, we
shall find them doubtless too numerous; but if we con-
sider them in the relation they bear to the liberty and
security of every individual, we shall often find them too
few, and be convinced that the trouble, expense, delays,
and even the very dangers, of our judiciary proceedings,
are the price that each subject pays for his liberty.   In
Turkey, where little regard is shown to the honor, life,
or estate of the subject, all causes are speedily decided.
The method of determining them is a matter of indif-
ference, provided they be determined.   The bashaw,
after a quick hearing, orders which party he pleases to
be bastinadoed, and then sends them about their busi-
ness.   But in moderate governments, where the life of
the meanest subject is deemed precious, no man is
stripped of honor or property but after a long inquiry,
and no man is bereft of life till his very country has

attacked him, — an attack that is never made without leaving him all possible means of making his defense. In republics, it is plain that as many formalities at least are necessary as in monarchies. In both governments they increase in proportion to the value which is set on the honor, fortune, liberty, and life of the subject." 1 Montesquieu's Spirit of Laws, b. 6, c. 2, pp. 84, 85. It should be borne in mind that this great lawyer wrote these words nearly 150 years ago, under the French monarchy, long before the foundation of this federal republic. How much more earnestly, then, might these thoughts be expressed by a citizen of the freest, strongest, and best government ever designed by the genius of man.

We have searched this record in vain for any material error, and we are fully satisfied that the defendant has had a fair and impartial trial, in strict conformity with all the forms prescribed by law, and that the judgment of conviction should stand affirmed.

*Judgment affirmed.*

GALBRAITH, J., and BACH, J., concur.