ERASTUS M. NASH & others, executors, *vs.* HENRY HUNT.

Plymouth. Oct. 20. — Nov. 10, 1874. AMES & MORTON, JJ., absent.

On the issue whether an instrument offered for probate as a will was executed when the testator was of sound and disposing mind, the heir contended as one ground for inferring unsoundness of mind that the will was unreasonable, and introduced evidence tending to show that he had been in partnership with the testator and other persons, and that, upon closing up the partnership affairs, his interest amounted to a large sum which he had transferred to the testator upon the assurance that upon the testator's death the estate would become his; that the fact and amount of his interest had been established by the report of a master in a suit in equity, to which he and the testator were co-defendants, and that the final settlement of the partnership affairs had been made in accordance with that report. He then offered in evidence a duly certified copy of the record in that case, and of the master's report. This evidence was excluded. *Held,* that he had no ground of exception.

The report of a master in chancery is not evidence as an adjudication between the parties until it has been accepted and a decree rendered accordingly.

If one party to a suit contends that a transfer of property was made by a certain instrument in writing, and testifies as to the circumstances attending it, the other party may show that the transfer was made by a later instrument; and the evidence of a witness, who prepared the instrument and attended to the execution of it, that there was no such consideration or understanding as had been testified to, is competent; and the witness may also be asked as to the circumstances attending the execution of the second instrument, and why it was executed.

An exception to evidence, admitted at the trial under a general objection, will not be sustained in this court, because the witness testified in regard to a privileged communication, if the evidence is otherwise competent.

On the issue whether an instrument offered for probate as a will was executed when the testator was of sound and disposing mind, the evidence of a witness who had had an interview with the testator three weeks before the date of the will, that he

"*observed* no incoherence of thought in the testator, nor anything unusual or singular in respect to his mental condition," is competent.

On the issue whether an instrument offered for probate as a will was executed when the testator was of sound and disposing mind, the answer of a witness, who is admitted to be an expert in mental diseases, to a question as to his opinion of the testator's insanity, based upon various hypotheses, is not rendered incompetent because the witness has already testified that he was ignorant of the effect of a certain disease upon a person's mental condition, and the fact that the testator had this disease was included in the facts assumed in the question.

At the trial of an issue whether an instrument offered for probate as a will was executed when the testator was of sound and disposing mind, a subscribing witness who had testified in chief as to the execution of the will and the sanity of the testator at that time, and also as to the facts connected with the preparation of the will, and interviews with the testator in relation thereto, was recalled in rebuttal, and examined anew without restriction upon the points in controversy. *Held*, that the objecting party had no ground of exception. ·

At the trial of an issue whether an instrument offered for probate as a will was executed when the testator was of sound and disposing mind, a witness was allowed to add to his negative answers to certain questions put to him in regard to whether he had made certain statements about the mental condition of the testator, the following reasons for such denial: in one case, "because I never thought of such a thing as his not being sane," and in the other, "because it was not true." *Held*, that the objecting party had no ground of exception.

On the issue whether two instruments offered for probate as a will and codicil were procured by undue influence, it appeared that the alleged will recited that the testator was a partner in a firm, and recommended his trustees, after making certain payments, to leave the residue of the estate in the hands of the firm, "leaving it to said firm to pay to my son such share of the net profits of their business, as to said firm may seem fair and just, and according to our verbal understanding." There was no other evidence than the will of any verbal understanding on the subject. The son was not a partner in the firm, and the testator had, after the will was made and just before signing the codicil, endeavored to have the firm employ his son. The partners refused to make any definite agreement, but said perhaps they would give the son a certain sum a year. This answer was reported to the testator, who said, "Well, we will leave it as it is." The codicil was then signed. *Held*, that the will did not indicate an agreement that the son should have an interest in the firm, or be paid any definite share of the net profits, and that in the absence of evidence showing that the expectation of the testator was encouraged by the partners, the party contesting the will was not entitled to have the jury instructed that if the will was made upon an understanding with the partners, or either of them, that a share of the net profits of their business should be paid to the son, and if they denied any interest of the son under the will, the jury would be authorized to find that the will was made under undue influence.

APPEAL by the son and sole heir at law of Thomas J. Hunt, late of Abington, from the allowance by the judge of probate of two instruments, one as his last will, and the other as a codicil thereto, the execution of which the appellant contended was pro-

cured by undue influence, and while the testator was not of sound and disposing mind.

At the trial, before *Ames*, J., of issues framed on each allegation, the jury found in favor of the will and codicil, and a bill of exceptions, in substance as follows, was allowed:

The will of the testator, dated December 31, 1872, after providing for the payment of his debts and certain legacies, contained the following provisions:

" All the residue and remainder of my property and estate in possession or action, remainder or reversion, and wherever situate, real, personal or mixed, I devise and bequeath to Erastus M. Nash and Gilman Osgood, both of said Abington, and Peter Semonin, of Evansville, Indiana, and to the survivor of them, and to the heirs of such survivor. In trust, however, and for the uses and purposes following, namely, 1st. To permit my wife Sarah, and my son Henry, to occupy and improve and take the rent and profits of all my real estate, keeping the same in repair, and paying all taxes and insurance during the lifetime of my said wife and son and the survivor of them, and to collect and receive all my personal estate, and the same to convert into money, (except such portions as may be required for the use of my said wife and son,) and said moneys according to their best judgment safely to invest, and the same from time to time to reinvest, and the net income thereof, and so much of the principal as may be necessary to apply to the liberal support, maintenance and comfort of my said wife so long as she may live, all to be in lieu of her dower; and after said provision for my said wife, the residue of said income to pay over to my said son so long as he may live; and upon the decease of the survivor of my said wife and son, to pay over and convey all the real and personal of said trust estate to the heirs at law of my said son, according to the statutes of descent and distribution of this Commonwealth.

" And my will is that said trustees have power, upon the request in writing of my said son, if said trustees deem it for the best interest of my estate, from time to time to sell and convey any portion of my real estate, and the proceeds thereof to invest, and hold with the other personal estate, using the income as above set forth.

" And my will further is that said trustees have power, if they deem it for the best interest of my said son, at any time during the lifetime of his said mother, to furnish my son with money to invest in his business, not exceeding ten thousand dollars. And after the decease of his said mother, with a further sum not exceeding ten thousand dollars.

" And my will further is that said trustees expend a sum not exceeding five thousand dollars for the improvement of the burial lot belonging to myself and my deceased brother Joseph, in the Mount Vernon Cemetery in said Abington.

" And whereas I am a member of the firms of Hunt, Semonin & Co., and Semonin, Dixon & Co., and have an equal third part of the profits of each firm, and have full confidence in the integrity and ability of my said copartners; therefore my will is that my said trustees have full power after providing for the foregoing payments out of my personal estate and out of funds due me from said copartnership, to allow the residue of the amount due my estate out of said firms to remain in the hands of said Semonin & Dixon on their note on interest, not to exceed seven per cent. per annum for such time, and I recommend to said trustees so to do, as to my said trustees may seem safe and judicious, leaving it to said Semonin & Dixon to pay to my said son such share of the net profits of their business as to said Semonin & Dixon may seem to be fair and just, and according to our verbal understanding.

" And I do hereby nominate said Erastus M. Nash, Gilman Osgood and Peter Semonin, to be executors of this my will, and I request that they shall be exempt from giving a surety or sureties on their official bonds both as executors and as trustees."

The codicil dated December 31, 1872, contained the following provision: " If the executors and trustees named in my said will, after collecting from the firms of Hunt, Semonin & Co., Semonin, Dixon & Co., the sums first named in my will, amounting to thirty-four thousand dollars, shall decide to collect from said firms the balance due my estate as soon as may be, then my will is that said Semonin & Dixon, my surviving partners, shall not be compelled to pay such balance faster than in the following proportions: $15,000 in four and one half years, $15,000 in five years, and $20,000 in five and one half years, all after said first

named collection, and such further reasonable time as with reasonable diligence may be necessary for the collection of outstanding copartnership claims; said payments of $15,000 and $20,000 being increased or diminished in proportion to the amount found due my estate from said copartnership assets."

The appellees presented the written instrument purporting to be the last will of the deceased, with the codicil. The three attesting witnesses were called, and were asked the usual questions concerning the execution of the will and codicil, and the condition and sanity of mind of the testator at the time.

Perez Simmons, a counsellor at law, was one of these witnesses. He testified that he was frequently consulted by the testator professionally; that he received a note from the testator, in consequence of which he went to see him, and was instructed as to the will; and that a rough draft of the proposed will was made, containing various erasures and interlineations. He was fully examined and cross-examined as to all the circumstances attending this draft and as to the erasures, &c., and also as to the execution of the will and the codicil. And upon intimation from the judge that the appellees might give further evidence upon the question of sanity, in reply to such as should be given on the part of the appellant, they rested their case.

The appellant testified without objection, that he had an interest as a partner in the firm of Varney & Harvey of the value of from $33,000 to $34,000; that the firm consisted of A. B. Harvey, William H. Varney, John Lane, the testator, and himself; and also stated that the partnership affairs were adjusted by a suit in equity in this court, brought by one of the partners for that purpose, and were finally settled by the several partners in accordance with the report of a master in chancery to whom the account had been referred for a statement by the court, who found the appellant's interest as above stated.

The appellant then offered a duly certified copy of the record of that case, with the report of the master in chancery, but upon objection the judge excluded the evidence.

The appellant also testified that while said suit was in progress, his father requested him to go to the office of Hutchins & Wheeler, who were the attorneys of the testator in said suit; that he went accordingly in company with his father; that he

there had an interview with Hutchins alone, while his father was in another room; that then the three had an interview together, in which Hutchins urged him to assign his interest in the concern of Varney & Harvey to his father, in order to enable the father to negotiate a settlement; that Hutchins further urged the appellant to do this, and said in substance that he would have all his father's property at his death, and it would make no difference to him if the father should hold his property; that soon after this interview, the appellant had an interview with his father at Abington upon this subject, in which he stated to his father that he did not like to make such an assignment, but that under the circumstances he should do so, and that he did execute an assignment under seal, which, after his father's death, was found among his papers. The assignment was produced, and bore date October 24, 1867, and is as follows: "Know all men by these presents, that I, Henry Hunt, of Abington, in the county of Plymouth, in consideration of one dollar to me paid by Thomas J. Hunt, my father, of said Abington, receipt of which is hereby acknowledged, hereby sell, assign and transfer and set over to the said Thomas J. all my right, title, claim and interest as a partner in the co-partnership of Varney & Harvey, or claim upon John Lane, arising out of any partnership with him under the style of Varney & Harvey, or claim upon said Varney & Harvey, or the said Thomas J. Hunt arising out of said copartnership. To have and to hold to him, the said Thomas J. Hunt, his executors, administrators and assigns, with power to demand and secure the same, using my name if necessary in any and all process."

The appellees in rebuttal called Henry C. Hutchins, who testified that he was of counsel for the defendants in the suit of Harvey v. Hunt and Lane & others; that the above assignment was in his handwriting, but that he did not recollect where it was executed nor the circumstances under which it was made, nor did he recollect that Henry Hunt had any conversation with him in regard to its execution. The witness then produced the following instrument, signed and sealed by the appellant, and dated February 19, 1870: "Whereas a suit in equity for the settlement of the partnership affairs of Varney & Harvey is now pending in the Supreme Judicial Court for the county of Suffolk, wherein A. B. Harvey is complainant, and Thomas J. Hunt and John

Lane, and William H. Varney and Henry Hunt are defendants, which said suit has been referred to Henry W. Paine, Esq., as master, to state the accounts of the parties therein. Now know all men by these presents, that I, the said Henry Hunt, in consideration of one dollar to me paid by the said Thomas J. Hunt, the receipt of which is hereby acknowledged, do hereby sell, assign and transfer to the said Thomas J. Hunt all claim which I now or may hereafter have by virtue of said suit, or any judgment or decree therein, upon the said Thomas J. Hunt, or John Lane, or either of them, or any of the parties to said suit, and I do hereby authorize the said Thomas J. Hunt to prosecute said suit to final judgment for his own benefit, and the proceeds to enjoy to his own use. And I do further sell, assign and transfer to the said Thomas J. Hunt all claims which I have upon the said John Lane, or the said Thomas J. Hunt, or any of the parties to said suit as a member of the firm of Varney & Harvey."

Hutchins also testified that there never was any conversation in his presence in which, as an inducement to Henry to sign that or any other release, anything was said about his having the father's estate after the decease of the latter. The witness was then asked what were the circumstances attending the execution of the paper dated February 19, 1870, and why it was executed. This question was objected to by the appellant, but the judge ruled that, as the witness was counsel in litigation in which the deceased and the appellant were more or less concerned, and as the paper was drawn up at the witness's office and under his direction, the question might be put. To this ruling the appellant excepted. The witness then testified that the purpose with which that paper was prepared and its execution obtained was to put the father's interest where it belonged ; treating and assuming Henry's interest in it as nominal ; " to restore the estate to the father. A portion of it had been put in the son, and the paper was made to restore it to the father. This was well understood. I considered the son's interest in it as merely nominal. I know that I was directed to prepare these papers, and I knew what the object was. They were prepared and here they are, and that is all I know about it." He did not testify that Henry said it was nominal or anything to that effect, or that he, Henry, was present or was consulted about the preparation of that paper. He also

testified that this took place before any attempt had been made to compromise the suit, but that there was a series of papers, of which this was one, for the purpose of making an adjustment; there was an arrangement with Harvey, and, as part of that arrangement, there was a subsequent one with Hunt and Lane. "I arranged it for them and got all settled, and this was one of the papers of adjustment that was necessary to be executed." The paper was admitted in evidence, and to its admission the appellant excepted. The witness was also asked whether, at the time that the paper of February 19, 1870, was executed at his office, anything was said in regard to the consideration, in connection with the final disposition of the father's estate. On objection the question was allowed, to which ruling the appellant excepted. The answer was in the negative.

The appellees called Gridley Beal in rebuttal, who had been long and well acquainted with the testator, and inquired of him as to certain conversations with the testator, one of which he said took place in the spring of 1872, concerning the views of the testator as to the length of time it would require to settle the testator's business in the West. Under the objection of the appellant, the conversation was admitted, and the witness testified that the testator said it would require four or five years to withdraw his capital from the West so as not to injure his partners there. The judge admitted this testimony, the appellant's counsel having stated in his opening that the provisions contained in the will on that subject, and the fact that no security was required of his partners by its terms, were so unreasonable as to be evidence tending to prove unsoundness of mind or undue influence. The witness, under objection from the appellant, was also permitted to give an account of a conversation on December 12, 1872, in which the testator spoke of retiring from business, but said he could not do so, if living, in less than five or six years, without injury to his partners; and that he had opportunity to know them, and they were fair and honorable men. He also testified that the testator named all his sisters, spoke about the circumstances of one of them, and said that she and her husband were growing old and could not pay for their place; and on being told by the witness, in answer to a question, that the incumbrance on their place was about one thousand dollars, expressed a purpose

to provide for discharging it. The appellant had offered evidence which he claimed showed insanity of the testator in November 1872, and afterwards till the execution of the will and codicil. The witness also said, under objection, that during this interview he observed no incoherence of thought in the testator, nor anything unusual or singular in respect to his mental condition.

No evidence had been offered by the appellant respecting either of these conversations, or that the testator had ever said anything inconsistent with what had been attributed to him by the witness Beal on these occasions.

It was admitted that the testator died of Bright's disease of the kidneys. The appellant had called experts in insanity, who had testified that in their opinion a person dying of this disease, whose kidneys, heart, arteries and other internal organs were diseased in the manner in which the testator's were found to be by the autopsy, must in their judgment have been of unsound mind, as long prior to his death as December 21, the date of the execution of the will; that they were familiar with Bright's disease of the kidneys, and that in a large proportion of cases it impaired the mental faculties; that sometimes this was the case where a common observer would not detect the fact; that a patient suffering from this disease might secretly cherish feelings of hostility to his friends, wholly at variance with those which he entertained when in a normal condition.

In rebuttal, the appellees called a physician admitted to be an expert in the treatment of insane patients and in mental diseases, and asked this witness if he knew the effect of Bright's disease of the kidneys upon the mind. He answered that he did not. He was then asked by appellees if Bright's disease necessarily produced insanity, to which he answered that he did not know enough about Bright's disease to say whether or not it necessarily produced insanity. He was then asked by the appellees this question: " Suppose a person dying on the 9th day of January, of Bright's disease of the kidneys, who had been ill since the last of the November next previous, and had during that period been visited daily by his family physician, who, till within two or three days of the patient's death, discovered no indication of mental unsoundness, had had several protracted conversations with his legal adviser concerning the disposition of a large estate, and had

dictated the terms of a will wherein he made bequests to numerous members of his family, designated his trustees and executors, provided for the settlement of his partnership affairs, had several conversations with his partner in relation to the partnership business, conversed with several of his friends in regard to business matters, gave his pocket-book with its valuable contents to his executor, and told him to take charge of it, and throughout all, till within two or three days of his death, evinced no lack of comprehension or intelligence, what would be your inference of the patient's mental condition at the time of these several transactions ? " The question was objected to by the appellant, but was permitted to be put by the judge, and the witness answered that he should consider him of sound mind.

The appellees called in rebuttal the person who wrote the will and codicil and who had been called as one of the subscribing witnesses to them, and had testified fully as to the circumstances under which they were written and executed, and that in his opinion the testator was of sound mind when both were executed; also that he had been the legal adviser of the testator for many years, and had been consulted fully by him on many important matters. The counsel for the appellant objected to the witness giving any testimony in rebuttal bearing upon the question of the testator's sanity, apart from the question of undue influence, but he was permitted without restriction to give in detail an account of interviews with the testator on December 16, 21 and 31, 1872 ; and he was also allowed, under objection, to state that in none of these interviews did he perceive anything in the testator indicating want of comprehension, lack of intelligence or understanding. The witness was also asked whether he had said to the appellant, as the latter had testified, " Do you think your father was sane when he made his will ? " and he answered, " I never did, because " — Objection was made to his giving a reason in that form, but he was allowed to do so, and continued, " because I never thought of such a thing as his not being sane." The witness was also allowed to state under objection, in contradiction of testimony given by the appellant, that he did not tell the latter " your father after he had made his will seemed to lose all comprehension of what he had been doing, and said, ' Where has Henry been all this time ; what have I done for Henry ? ' " because it was not true.

The appellees offered evidence tending to show that the testator, at, about and just before the time of the execution of the codicil, made frequent efforts with Dixon, a member of the firm of Semonin, Dixon & Company, to prevail upon him to admit Henry Hunt into the employment of that firm, with the understanding that he should remain in Massachusetts, and take care of his mother, but to do what he could to aid the firm in their purchases here. It did not appear that anything definite was assented to by Dixon on this subject, or that he went any further than to say that perhaps they could give Henry a compensation of $600 a year, " work or play," to be increased if his services should prove more valuable. This answer was reported to the testator, who then said " Well, we will leave it as it is." There was no evidence, other than the will itself, of the existence of any verbal understanding on that subject. This attempt at negotiation was carried on through a third person, at the time of the execution of the codicil. There was also evidence to show that Dixon was frequently at the house of the testator, and had several interviews with him just previous to the making of the will.

The appellant testified that some months after the testator's death he had a conversation with Semonin in the presence of Dixon, in which Semonin expressly denied that the appellant was entitled to any interest in their business, and upon being told by the appellant that the will gave him an interest in the business, said, " I don't know anything about your will."

Neither Semonin nor Dixon had ever in any way recognized any right of the appellant to an interest in their business or to any share of the profits of the same, though at the trial more than sixteen months had elapsed since the death of the testator.

The appellant requested the judge to instruct the jury that if the will was made upon an understanding with Semonin and Dixon, or either of them, and to which they or either of them were parties, that a " share of the net profits " of their business should be paid to Henry Hunt ; and if Semonin and Dixon denied any interest of the son under the will, the jury would be authorized to find that the will was made under undue influence.

The judge declined so to instruct the jury, there being nothing in the oral evidence which required this instruction. The evidence tended to show that the business of the firm of Semonin,

Dixon & Company could not be wound up without serious loss in less than three or four years; and that the Western partners were solvent, and were men of considerable property over and above all their debts.

To all of which rulings, and to the refusal of the judge to rule and instruct the jury as requested, the appellant alleged exceptions.

*E. Avery & E. P. Brown*, for the appellant.

*G. Marston & J. M. Keith*, for the executors.

WELLS, J.   To show that the will was unreasonable in its provisions for the appellant, who was the son and sole heir of the testator, as one ground for inferring unsoundness of mind, the appellant testified that he had been partner with his father in the firm of Varney & Harvey, and that his share, upon closing up that firm, amounting to $33,000 or $34,000, had been transferred by him to his father for the purpose of facilitating the settlement of the partnership affairs, with the understanding and assurance that all his father's estate would become his upon his father's decease.   He also testified that the fact and amount of his interest had been established in a suit in equity, by the report of a master, to whom the case had been referred by the court; and that the final settlement of the partnership affairs had been made in accordance with that report.   The appellant then offered in evidence " a duly certified copy of the record of that case, with the report of the master in chancery."   The exclusion of this record forms the ground of the first exception.

The reasons for its admission, now urged upon the court, are 1st.  " Because it contained the answer of the testator, which did set forth that the appellant was a partner in said firm, and was entitled to a portion of the profits."   But the relations of the testator and the appellant, as co-defendants in the suit, were not such as to make the answer competent evidence in favor of one against the other, as matter of pleading merely.   As an admission in writing, the original and not the copy of record was the proper means of proof.   Beyond that, the offer of the record was general, as of a record of adjudication; and did not indicate the special ground upon which it is now claimed to be competent. 2d.  " Because it showed a conclusive determination of the rights of the testator and the appellant under the copartnership, and

the interest of each in the assets of the copartnership." 3d. "Because it was a final adjudication, conclusive upon both the testator and the appellant, and was the best evidence known to the law."

The record is not made a part of the bill of exceptions, nor referred to. We can know its character only by the statements in regard to it in the exceptions themselves. From these we think it is to be inferred that the suit in equity did not proceed to final judgment, but was settled by the parties upon the basis of the report of the master without further adjudication thereon. If so, the record would not be competent to establish the amount of the appellant's interest. The master's report is not evidence as an adjudication between the parties until it has been accepted, and judgment rendered upon it.

It might have been competent for the court to have admitted the master's report in connection with the testimony of the appellant that the settlement was made in accordance with it, as aiding in showing more definitely the amount actually received by the testator on account of the appellant's share ; but whether the circumstances were such as to make it properly admissible for that purpose, is a matter to be determined very much in the discretion of the judge at the trial. It not being competent as independent evidence, we cannot see upon the exceptions that there was any error in excluding it for the purpose suggested.

It might perhaps be reasonably inferred that the interlocutory decree, by which the case was referred to a master to state the account, did adjudge the appellant to be a partner ; though such is not the necessary inference.

To this, as well as to the whole offer of the record, it is answered by the executor that neither the fact that the appellant was a partner, nor the amount of his interest, nominally, was at all in controversy. And, upon examining the entire bill of exceptions, it appears to us that this position is sustained. Not only did the appellant put in evidence an instrument transferring to the testator his interest as a partner in the firm, but another instrument of like import of a later date was put in evidence on the part of the executors. The controversy appears to have been entirely in regard to the time and purpose of the transfer, and not at all as to the existence of the partnership relation.

Upon the whole we are satisfied, from these various considera-tions, that the appellant has shown no sufficient and reasonable ground of exception to the ruling by which the offer of the copy of record, as made by him, was excluded.

The appellant also alleges exceptions to the introduction by the executors of the second instrument of transfer, above referred to, and to the inquiries put to Mr. Hutchins, who prepared the in-strument, in regard to it. As to the instrument, we think it was clearly admissible. The appellant had introduced one of similar import of an earlier date, and testified in regard to the circum-stances and purpose of its preparation, and the inducements under which he executed it; connecting Mr. Hutchins therewith. The testimony of Mr. Hutchins tended to show that whatever transfer had been made was effected by the second and later instrument. If it was of any consequence whether it was effected by one rather than the other, the executors were entitled to show that it was by the later one, and to introduce the instrument by which such a transfer appeared to have been made at the later date.

It was competent for the witness, who testified that he arranged the whole matter for the two parties and prepared and procured the execution of the instrument, to testify further that at the time of its execution no such consideration or understanding, as the appellant had sworn to, was mentioned in regard to it. It was a question for the jury to determine whether this or the paper of earlier date was the real instrument of transfer, and to apply the evidence accordingly.

The inquiry of this witness, in regard to the circumstances attending the execution of the paper dated February 19, 1870, and why it was executed, was properly allowed to be put. It was an open question whether the second assignment was not the real instrument by which the transfer was effected, of which the appellant testified. If it was, the answer might contradict or explain that testimony. It might also have a tendency to con-nect the transactions of which the appellant had testified with those testified to by Hutchins, and with the second assignment. If Mr. Hutchins made the whole arrangement between and for the parties, as he testified, he might fairly be supposed to be able properly to answer the question "why it was executed." It was

in reply to the account which the appellant had given of what might be found to be the same transaction.

The objection and the exception are limited to the inquiry. The statements, which the witness proceeded to make in answering the inquiry, are objectionable in form, and some of them in substance. They might have justified the court in interfering, of its own motion. But it does not appear that the party made any objection to the mode of answering, and no request was made to the court to strike out any part of the answers, either as not responsive, or as improper in form or substance. It is not for us now to consider objections that might have been made at the trial, but were not made.

The last remark applies also to the objection, now made, that the relation of Mr. Hutchins to the parties was that of attorney and client; and that his testimony was a breach of the privileges of that relation. That the objections to his testimony could not have been based upon that ground, at the trial, is manifest from the reason assigned by the court for considering his testimony competent in another aspect; to wit, that " the witness was counsel in litigation in which the deceased and the appellant were more or less concerned," and " the paper was drawn up at his office and under his direction." Whether communications, of which a witness is asked to testify, are privileged, depends upon various considerations of fact, to be first investigated by the judge who is called upon to rule; and his finding upon those facts may be such as to make his ruling upon the point conclusive. In this case, the point not having been presented at the trial, there is no proper finding of the facts upon which it can be decided, and, in reality, no ruling upon the point to be revised; and it cannot be considered as involved in the ruling permitting the witness to testify.

Objection is made to the testimony of the witness Beal, who had conversations with the testator, and who was allowed to state that at the last interview before the date of the will, he " observed no incoherence of thought in the testator, nor anything unusual or singular in respect to his mental condition." We do not understand this to be the giving of an opinion as to the condition of the mind itself, but only of its manifestations in conversation with the witness. So far as his mental condition was

manifested to the witness by that interview, in conversation, looks or demeanor, he could properly state, as a matter of observation, whether it was in the usual and natural manner of the testator or otherwise. "Incoherence of thought" has reference to the ideas expressed or conveyed to the hearer, rather than to the condition of the mind of the speaker. There is no essential difference between these answers and those allowed in *Barker* v. *Comins*, 110 Mass. 477. The other objections to the testimony of Beal touch its effect and not its competency.

The witness called by the executors as an expert to prove the soundness of the mind of the testator at the date of the will, admitted that he had no knowledge of the effect of Bright's disease of the kidneys upon the mind. He was admitted to be an expert in mental diseases. From the numerous hypothetical facts included in the question put to him he might be able to pronounce with certainty that the person of whom those facts were true must have been sane, whatever influence might be attributed or expected ordinarily to follow from the disease of which the testator died within less than a month from the date of the will. The effect of his answer was not an opinion as to the influence of Bright's disease upon the mental condition, but merely that the other facts assumed in the question, if true, would show conclusively that the testator was sane at the time of which they were predicated. If there was thought to be danger of any misapprehension as to the bearing of his testimony upon the effect of Bright's disease, from including that among the facts assumed in the question, a little cross-examination would have corrected the difficulty. The testimony was not rendered incompetent because the inquiry included one fact from which the witness professed to be able to draw no inference.

An objection is also urged because, after the appellant had introduced his evidence, the executors were allowed not merely to meet that evidence, but also to introduce further affirmative testimony in support of the will; and especially because one who had been previously called as a subscribing witness and had testified not only as to the execution of the will, and the sanity of the testator at that time, but also as to the facts connected with the preparation of the will and interviews with the testator in relation thereto, and " that he had been the legal adviser of the testator

for many years, and had been consulted fully by him on many important matters," was allowed to be recalled and examined anew without restriction, upon the points in controversy.

It is perhaps a sufficient answer to this objection, that the order in which the testimony shall be introduced is, in the main, subject to the discretion of the presiding judge, and not a matter of exception. But further, the order followed at the trial of this case is that which is generally found most convenient for the trial of issues of this nature, and is in accordance with well established practice. On the issue of sanity, the burden rests upon those who offer the will for probate. It is to establish the sanity of the testator at the very time when the will was executed. Ordinarily the direct evidence of the subscribing witnesses is sufficient for this purpose in chief, making a *primâ facie* case. It would doubtless be competent to strengthen this direct testimony by the inferences to be drawn from proof of sanity before and after the date of the will, within a limited range of time. But, until the evidence of the contestants is produced, it is difficult to determine the proper limits of that range. Simplicity in presentation of the question, as well as practical convenience in conducting the investigation, favors the order of trial adopted in this case.

The subscribing witness, who wrote the will, was allowed to add to his negative answer to certain questions, put to him in regard to what he had said about the mental condition of the testator, his reasons for such denial. In one case, " because I never thought of such a thing as his not being sane ; " in the other, "because it was not true." So far as the objection to these answers rests upon the point that they were not responsive, or rather, that they went beyond what was requisite for a sufficient and proper answer to the question, it is a matter within the discretion of the presiding justice at the trial. The nature of the inquiries, being intended to discredit the direct testimony of the witness, was such as might make it reasonable that he should be allowed, not merely to negative the particular fact or expression suggested, but to repel the imputation that he had any knowledge or had ever entertained an opinion contrary to what he had testified to. The first answer went no farther than that, and we do not see that it had any bearing as affirmative evidence which could make

it open to exception in point of substance. The second, so far as it had any bearing as affirmative evidence, was competent in itself.

The refusal of the instruction prayed for, on the ground that there was " nothing in the oral evidence which required " it, was proper. Giving to the language of the will its fullest effect, it does not indicate any agreement or promise that Henry Hunt should have an interest in the copartnership of Semonin and Dixon, or be paid any definite share of the profits ; but at most only an expectation that in consideration of the provision by which his capital was allowed to remain in the firm, Semonin and Dixon might be disposed to pay to his son some portion of their profits, in addition to interest; it being left wholly to them to do so or not, as it should to them " seem to be fair and just." There was not only no evidence that this expectation was encouraged by Semonin and Dixon to influence the provisions of his will, but the communications upon the subject between the testator and Dixon, after the date of the will, and before the execution of the codicil, and the explicit conclusion of the testator to "leave it as it is," notwithstanding Dixon's refusal to give any definite promise or distinct assurance upon the subject, show that there was no ground for requiring such an instruction arising from the terms of the will and codicil, and the circumstances of their execution.                                             *Exceptions overruled.*