### BELL et al. v. BLACKWELL et al.
### (No. 8646.)

(Court of Civil Appeals of Texas. Galveston. April 1, 1925. Rehearing Denied May 7, 1925.)

1. Evidence &#9758;478(1)—Nonexpert witnesses properly permitted under facts to testify as to mental condition.

In will contest, nonexpert witnesses, who had long known testatrix, *held* properly permitted to testify that from their observations they had discovered nothing out of the ordinary in appearance of testatrix, her actions or conduct, as such matters related to her mental condition.

2. Evidence &#9758;478(1) — Rule of nonexpert's testimony as to mental condition, stated.

One who has known testatrix intimately for long time with full opportunity to observe her appearance, action, and conduct may state, not only things which to them would indicate change in her mental condition for the worse, but, to show soundness of mind, that there was no change in her mental condition during his acquaintance with her.

3. Insane persons &#9758;2—How insanity and unsoundness of mind shown by appearance and proof of acts and conduct, stated.

Insanity and unsoundness of mind may be shown by appearance and proof of acts and conduct out of the ordinary, which, to one of ordinary intelligence, would indicate abnormal state of mind, insanity, or unsoundness of mind.

4. Insane persons &#9758;2—How unsoundness of mind proved, stated.

To prove that one is of sound mind, it is necessary to show only that he is not known to be guilty of any act or conduct which would indicate to one of ordinary intelligence that his mind is unsound.

5. Evidence &#9758;471(2)—Permitting neighbors to testify that testatrix regarded children of half-brother as her own and had mother's love for them held without error.

In will contest, permitting neighbors of long standing to testify that testatrix regarded children of her half-brother, as her own and had a mother's love for them *held*, under facts testified to by witnesses, without error.

6. Wills &#9758;400—Error, if any, in explanation in connection with submission of will contest on special issue, held harmless.

In view of pleadings and evidence in will contest, error, if any, in explanation, in submission of special issue as to mental capacity, that will was being offered for probate by proponent and contestants were opposing it on grounds of mental incapacity of testatrix, *held* harmless.

7. Wills &#9758;330(1)—Charge defining "sound mind" held sufficiently comprehensive.

Where will contest was submitted on sole issue of testatrix mental capacity, charge that proponent had burden of proof to show she was of "sound mind," that is, that she had capacity to know and understand what she was doing, and the effect of her act at the time she executed instrument, and that if she had such capacity her mind was sound, *held*, sufficiently comprehensive.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Sound Mind and Memory.]

---

**8. Appeal and error** ⟨key⟩**1060(1)—Argument of proponent's counsel misstating law as to mental capacity to make will held not to require reversal.**

In view of almost overwhelming evidence of testatrix's mental capacity to make will, error in overruling objection to argument of proponent's counsel that it was not necessary for her to comprehend nature and extent of estate or objects of her bounty and business she was about to transact *held* not to require reversal.

Appeal from District Court, De Witt County; John M. Green, Judge.

In the matter of the estate of Sarah Jane Bell. Application of W. A. Blackwell and others for probate of will, contested by J. R. Bell and another. Judgment for proponent, and contestants appeal. Affirmed.

Richard Waldeck, of Cuero, W. T. Bagby, of Hallettsville, Fly & Ragsdale, of Victoria, and Dougherty & Dougherty, of Beeville, for appellants.

John H. Bailey, H. W. Wallace, and Crain & Hartman, all of Cuero, for appellees.

LANE, J. Miss Sarah Jane Bell died on the 13th day of November, 1922. She left surviving her, as her sole heirs at law, J. R. Bell, a brother of the full blood, W. A. Bell, her nephew, a son of John Y. Bell, deceased, a brother of the full blood, W. A. Blackwell, Sr., a brother of the half blood, and Mrs. Myrtle Black, a niece. She left a will executed in manner and form as required by law, by which she made the following bequests: (1) To the Hillside Cemetery Association, $100. (2) To her half-brother, W. A. Blackwell, 320 acres of land, a part of the D. M. Stapp survey in De Witt county, 431 acres of land, a part of the Gardner survey in said county, two-fifths interest owned by her, in and to lots 5, 6, and 7 and eastern one-half of lot 4, block 75, in the city of Cuero, in De Witt county. (3) To Myrtle Black, her niece, a daughter of her deceased brother, John Y. Bell, and Cary Bell White, also a niece, a daughter of her brother Jas. R. Bell, jointly 226½ acres of land and a tract of 122 acres of land. (4) To Edwin Blackwell, a son of W. A. Blackwell, Sr., an undivided one-half interest in and to two tracts of land, one containing 640 acres, and the other 160 acres. Also all of a 150-acre tract and her home in the city of Cuero. (5) To her nephew W. A. Blackwell, Jr., son of W. A. Blackwell, Sr., an undivided interest in two tracts of land, one of 640 acres and the other of 160 acres. (6) To Jane Bell White and her brother John M. White, daughter and son, respectively, of her niece Cary Bell White, jointly, the sum of $500. (7) To Mrs. W. A. Blackwell, Sr., all of her silverware, which she might leave in her home at the time of her death. (8) To W. A. Blackwell, Sr., all the personal property which shall remain after a sale of a sufficient amount thereof to pay her debts and other personal bequests made in her will.

The provisions of the fifteenth, sixteenth, and seventeenth paragraphs of the will are as follows:

"15. It is my will that in the event of the death of my half-brother, W. A. Blackwell, Senior, before my death, then all of the property in this will bequeathed or devised to him, shall pass to and vest in his heirs at law then living in the same way his separate estate would vest under the Texas statutes of descent and distribution.

"16. My half-brother, W. A. Blackwell, Senior, has managed my property and affairs for some forty years, to my advantage and profit, and without charge. It is my will that no sort of accounting shall ever be required of him, and that in the settlement of my estate all matters between us shall be considered and taken as fully adjusted and settled and he shall not be held liable, or indebted or obligated to me or my estate in any way, on any account. I know that every transaction he has undertaken for me or in my name has been in the best of faith and without reward, and it is my will that he shall not be questioned in any way in regard to any transaction for me or in my behalf or in my name or any dealings between us, and he is by this will fully acquitted from any and every obligation to me or my estate.

"17. I name and appoint said W. A. Blackwell, Senior, as the executor of this my will, and direct that no bond or security shall be required of him as such; and it is my will that no other action shall be had in the probate court in relation to the settlement of my estate than to probate and record this will and return the inventory, appraisement and list of claims as required by law."

On the 6th day of January, 1923, W. A. Blackwell, Sr., the executor named in the will, filed an application in the county court of De Witt county for the probate of said will. Such application was contested by J. R. and W. A. Bell, upon the grounds: (1) That the testatrix was of unsound mind at the time of executing the will; (2) That the will was the result of undue influence exercised over testatrix by W. A. Blackwell, Sr.; (3) That the testatrix was under the insane delusion that W. A. Bell, generally known as "Al" Bell, was dead. On hearing in the county court, the will was admitted to probate, and the contest was carried by appeal to the district court of De Witt county. Upon hearing in said district court, the will was again admitted to probate. Contestants J. R. and W. A. Bell have appealed to this court.

The appellants admit that the evidence admitted was amply sufficient to support the finding of the jury that the testatrix was of sound mind at the time of the execution of the will, but they predicate their appeal on their contention that the court erred: First, in permitting several witnesses to give their opinion relative to the soundness or unsound-

⟨key⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ness of the mind of the testatrix; second, to give their opinion as to the feeling the testatrix had for W. A. Blackwell, Sr., and his sons, Edwin and W. A., Jr.; third, in giving an erroneous charge defining what would constitute an unsound mind in such cases; fourth, in refusing to give to the jury their requested charge defining what constituted a sound mind in such cases; and, fifth, that the judgment should be reversed because of certain argument made to the jury by counsel for the proponent.

Whether the will was executed in the manner and form as required by law, and whether it was the result of undue influence exercised over the testatrix by W. A. Blackwell, Sr., are questions not presented for our determination by the appellants. We shall therefore make no further mention of such matters.

By their first assignment, appellants insist that the court erred in permitting Berthold Schiwetz, over the objection of appellants, to answer, "There was nothing," to the following question: "Please state if there was anything out of the ordinary in the appearance of Miss Sarah Jane Bell, her action or conduct, with reference to whether she was a normal person and in possession of her mental faculties or not." The objection being that the question was leading and called for a conclusion of one who had not been shown an expert.

And by their second assignment, they complained of the action of the court in permitting W. K. Breeden, Mrs. McClanahan, Mrs. Davidson, Mrs. Seeligson, C. A. Waldeck, Mrs. Staerker, Mrs. Jones, Mrs. Breeden, Mrs. Cocke, Mrs. Donohue, and O. T. McAllister to testify, over their objection, that they had not upon any of their visits to Miss Sarah Jane Bell observed in her conduct or conversation anything which led them to believe that there was something wrong with her mind, or anything out of the ordinary with reference to her mind; the objections urged to such testimony being that the same was the conclusion of the witnesses such as only an expert witness could give.

As the two assignments, 1 and 2, present practically the same question, we shall consider them together.

It is now insisted by appellants substantially that the witnesses mentioned should have been confined in their answers to the statements of whether from their observations and conversations with testatrix they judged her to be of sound or unsound mind, and that they should not have been permitted to go further and state that she was a normal person in possession of her normal faculties and that there was nothing so far as they observed out of the ordinary in her appearance, her actions, or her conduct. There is no merit in appellants' contentions.

The witness Schiwetz testified that he was 55 years of age; that he had lived on the street and in the city of Cuero on which he and the testatrix had lived for 30 years; that he passed her house almost daily for many years, and had often had talks with her, and had had many business transactions with her; that he daily had conversations with the testatrix, and testified, without objection, that her mind was rational; that she was very alert and quick; that she was bright and emphatic. He also testified that he was a witness to her will; that testatrix, in his presence, discussed with her attorney, who prepared the will, its contents; and that at that time her mind was alert and quick.

Mrs. McClanahan testified that she had lived two blocks from the testatrix from 1890 to the time of the death of testatrix; that she had visited the testatrix often; that she would probably see her every three weeks and sometimes oftener; that she was at the home of the testatrix and saw her about three weeks before she died; that she never, on any of her visits observed any irrational conduct on the part of the testatrix; that at all times when she saw testatrix, her mind seemed perfectly clear; that she did not see anything that indicated in the least that her mind was not clear and that she was not at herself; that from her observations and her associations with testatrix, she thought the mind of testatrix was perfectly sound; that she never saw her when her mind did not seem perfectly sound; that she never saw her when her mind was anything but normal.

Mrs. Davidson testified practically the same as Mrs. McClanahan.

Mrs. Seeligson testified that she had lived in Cuero 40 years or more about two blocks from where Miss Sarah Jane Bell lived, that she visited Miss Bell often, that she visited her during the year of 1922, and that she conversed with her and observed her conduct and demeanor and condition. She testified that from her association with the testatrix, her observation of her, and her conversations with her in the spring of 1922, the mind of Miss Sarah Jane Bell was the same as ever as far as she could judge; that it was sound; that the witness saw nothing out of the ordinary about the testatrix during any of her visits; that the testatrix had a very strong will power; and that witness never noticed any change in the mental faculties of testatrix. She also testified that Miss Bell loved Edwin Blackwell and W. A. Blackwell, Jr., very dearly.

C. A. Waldeck testified that he had lived in Cuero about 6 or 7 years, and that his home was separated from that of Miss Sarah Jane Bell only by a fence; that he had known Miss Bell approximately 6 years; that during the 6 years he knew the testatrix he would see her once or twice a week and at other times possibly not so often;

that .during all that time on an average of once a week he had frequent talks with testatrix, and that from his knowledge of Miss Bell, from the conversations he had with her, and the different matters, in the opinion of the witness, the mind of the testatrix was sound; that he could not notice any mental change .in the testatrix during the 6 years he knew her; that her mind was just as active the last time he saw her as it was the first time he saw her.

W. K. Breeden testified that he was 64 years of age; that he was engaged in the mercantile business, and had been so engaged for 35 years in the town of Cuero; that his home was just across the street from the home of Miss Sarah Jane Bell; that he had lived at that place for 43 years; that he had known Miss Bell for 30 years; that they were intimate neighbors; that he visited the testatrix during the year of 1922; that the mental condition of testatrix was perfectly good and sound in his judgment; that on his last visit to the testatrix, which was in the summer of 1922, a few months before her death, she talked to him about various and sundry subjects; that on that occasion he observed nothing out of the ordinary in regard to the mental condition of testatrix; that she was as natural as ever; that mentally she was as bright as she had ever been; that she was of a very resolute character and a woman of strong convictions. He also testified that he visited Miss Bell in 1914, at the time Miss Bell executed a formal will; that Miss Bell's mental condition was always, in his judgment, excellent, absolutely sound.

Mrs. Staerker testified that she lived in Cuero, and had lived there for 50 years; that she had known the testatrix for 45 years or more; that she and the testatrix were very intimate; that they had visited one another frequently; that she visited Miss Bell, the testatrix, in 1922; that at this time she was contemplating an early trip to Germany, and on that occasion she and the testatrix discussed many subjects; that testatrix expressed regret that witness would be gone on her trip so long; that from her observation of Miss Sarah Jane Bell and her conversations with her, there was never such a thought entered her mind that Miss Bell could be classed as of unsound mind; that she was as sane as she was; that when she saw her in May, 1922, her mind was in absolutely the same condition as at all times before; that she seemed quite as natural to her as she ever was; that on said last-mentioned visit she noticed absolutely no difference in the mental condition of Miss Bell as compared to what it had been for many years.

Mrs. Jones testified that she had known Miss Sarah Jane Bell practically all her life; that she played at Miss Bell's home as a child; that the intimacy between them was cordial; that she visited the testatrix several times a year; that she visited her in the year of 1922; that during this visit she and the testatrix discussed old pioneer days; that the testatrix spoke of Mr. W. A. Blackwell, Sr., with deep affection, and called him "Brother Willie"; that she told witness that as a child W. A. Blackwell, Sr., had slept in her bed, and that now in her old age he was taking care of her and good to her; that from her observation of Miss Bell and her acquaintance with her, and the conversation she had with her, in her opinion Miss Bell was in absolutely sound mind and that her mind was in this condition in March, 1922; that witness saw no mental change in the condition of testatrix from October, 1921, to that in March, 1922.

Mrs. Cocke testified substantially to the same facts as did the witness above mentioned.

Mrs. Donahue testified that she had known Miss Bell, the testatrix, all her life; that she knew her some 30 years; that she had visited her many times, and in 1902 witness went to live in the home of Miss Bell and lived there for two years, and she felt towards Miss Bell as though Miss Bell were her own aunt; that after she removed from the home of Miss Bell, she had occasion to see her many times, the last time in July, 1921. She testified that she and Miss Bell had conversed on different things; that from her observation of Miss Bell in July, 1921, and from her conversations with her and knowledge of her, it was her opinion that the mind of the testatrix was absolutely sound; that there was nothing in the conduct, attitude, or conversation that made witness think that her mind was not natural or was unsound; that there was nothing on any of the visits out of the ordinary in the conversation and conduct of the testatrix indicating that she was of unsound mind; that testatrix was a very strong-willed person; that she knew her own mind absolutely and what she wanted to do; that she had a very deep love for W. A. Blackwell, Sr., and loved Edwin Blackwell like a son; that she also loved W. A. Blackwell, Jr., like a son; that she helped to bring the boys up; that she had been very much hurt with Jim Bell, Sr. (contestant), for many years.

O. T. McAllister testified he had lived in Cuero since 1894; that he was manager of the Electric Light Company; that he saw Miss Bell three or four months before her death; that he had business with her; that he had conversed with her about different matters; that he saw her about three months before she died; that, in his opinion, the mind of the testatrix was sound; that there was nothing that he could call to his mind that was in any way irrational.

There were many other witnesses who testified to practically the same facts as did

the witnesses named, but who were not mentioned in the assignments now being discussed.

[1] Under the facts and circumstances testified to by these witnesses, it was permissible for them to testify further; that from their observation they had not discovered anything out of the ordinary in the appearance of the testatrix, her actions or conduct, as such matters relate to her mental condition.

[2] It is well settled, we think, that one who has known a testatrix intimately for a long time with full opportunity to observe his or her appearance, action, and conduct may state, not only those things which to them would indicate a change in his or her mental condition for the worse, but to show soundness of mind, may also state the converse; that is, that there had been no change in his or her mental condition during his acquaintance with them. 22 Corpus Juris, 604; S. E. C. 697; Alexander on Wills (1917) vol. 1, p. 523, § 388, and authorities cited therein; Barton v. State, 89 Tex. Cr. R. 387, 230 S. W. 989; Turner v. State, 61 Tex. Cr. R. 97, 133 S. W. 1052; Garrison v. Blanton, 48 Tex. 301.

[3, 4] Insanity or unsoundness of mind, according to the authorities, may be shown by mere appearances and by proof of acts and conduct out of the ordinary which, to a person of ordinary intelligence, would indicate an abnormal state of mind, insanity or unsoundness of mind. These matters may be easily shown by the appearance, acts and conduct of the person but to prove that one is of sound mind just the reverse is true. To prove that one is of sound mind, it is necessary to show only that he is not known to be guilty of any act or conduct, which would indicate to a man of ordinary intelligence that his mind is unsound. The absence of acts and conduct indicating that one's mind is abnormal, and the absence of appearances indicating that such person is in an abnormal state of mind, is the only way in which such person can be shown to be of sound mind.

In the section cited in Alexander on Wills, it is said:

"Testimony that the witness had noticed 'no incoherence of thought,' and nothing 'unusual or singular,' in the testator's mental condition, was held admissible as relating to a fact, not an opinion. Nash v. Hunt, 116 Mass. 237. See, also, May v. Bradlee, 127 Mass. 414. Characterizing the acts and declarations of a testator as 'rational,' or 'irrational,' has been held to refer merely to matters of fact. Clapp v. Fullerton, 34 N. Y. 190, 90 Am. Dec. 681; Rider v. Miller, 86 N. Y. 507. Where the issue is as to whether testamentary capacity has been impaired or destroyed by sickness, a nonexpert who was well acquainted with the testator both in sickness and health may be allowed to testify that he saw no difference in his mental condition in sickness or in health. Such an answer is a statement of fact, not an opinion. Severin

v. Zack, 55 Iowa, 28, 7 N. W. 404; Kostelecky v. Scherhart, 99 Iowa, 120, 68 N. W. 591; Hertrich v. Hertrich, 114 Iowa, 643, 87 N. W. 689, 89 Am. St. Rep. 389. Testimony of witnesses, who had a greater or less degree of acquaintance with the deceased, in answer to questions that do not call for an opinion as to mental sanity, but as to how the deceased appeared to them, is admissible. Estate of Keithley, 134 Cal. 9, 13, 66 P. 6. A statement that a person appeared rational or irrational is one of fact resulting from observation, and is not an opinion as to sanity. People v. Manoogian, 141 Cal. 592, 595, 75 P. 177. Evidence that a person acted strangely or in a childish manner is a matter of fact and may be testified to by any one, Parsons v. Parsons, 66 Iowa, 754, 21 N. W. 570, 24 N. W. 564; and the question as to whether or not the testator was an eccentric man is not objectionable as calling for a conclusion. Fraser v. Jennison, 42 Mich. 206, 3 N. W. 882. See, also, In re Pinney's Will, 27 Minn. 280, 6 N. W. 791, 7 N. W. 144. Asking the witness to state if he had observed in the testatrix 'any peculiarities of manner, speech or conduct,' and the witness answering 'no,' it was held that the question did not call for the opinion of the witness, but for a fact. Hogan v. Roche's Heirs, 179 Mass. 510, 61 N. E. 57."

In Barton v. State, 89 Tex. Cr. R. 387, 230 S. W. 989, the court said a witness may testify that he saw nothing peculiar or unusual about the person. Such statements or testimony means there was nothing abnormal about the said person.

In Turner v. State, it is said that it is permissible for a witness to testify he saw nothing peculiar about a person; that such testimony was "but another way of saying that during their acquaintance with him, appellant's conduct, demeanor, speech, employments and mode of life were normal, not marked by peculiarities, outbreaks, idiosyncrasies, extravagance of deportment or other characteristics out of harmony with a normal man; impliedly, it may be said to have amounted to a declaration of facts which would be proof of sanity; it was not necessarily an opinion, but rather a statement of facts," from which the jury might or would form their own judgment.

In Garrison v. Blanton, supra, Chief Justice Roberts says:

"It may be very difficult, if practicable at all, to give the reasons for this judgment, just as it would be difficult to tell how the person of a friend is recognized, or to tell why a person's appearance indicates distress, mortification, or joy, unaccompanied by any acts of demonstration. Still, people are found to be in the daily habit of acting upon such judgment, so formed, in important matters. This is a ground for an opinion, or conclusion, or judgment, or whatever else it may be called. 1 Redfield on Wills, 137, 138."

[5] By the third assignment it is insisted that the court erred in permitting the witness Miss Fey to testify, over the objection

of contestants, that testatrix regarded Edwin and W. A. Blackwell, Jr., sons of W. A. Blackwell, Sr., as if they were her own children; that she practically had a mother's love for the boys. The objection made being that her testimony was but a conclusion of the witness; that it was not permissible for the witness to state the state of mind and degree of affection that testatrix had for the Blackwell boys.

We overrule this assignment. The witness testified that W. A. Blackwell and his family, consisting of his wife and two sons, Edwin and W. A. Blackwell, Jr., lived next door to testatrix and had so lived for many years, to witness' knowledge; that in addition to knowing that they were relatives of the testatrix, she knew that the relations which existed between her and the entire Blackwell family were very close and cordial; that testatrix loved the boys as her own; that she knew this of her own knowledge; that as long as she could remember the boys were in and out of testatrix's home just like she and her brother were in and out of their homes; they lived there practically; the boys lived there in testatrix's home; that they were always there; that testatrix regarded the boys as her own children, that is, she had practically a mother's love for them; that she had the greatest love for Mrs. W. A. Blackwell, who looked after her welfare to the best of her ability, just as if she had been her own sister; that Mr. Blackwell always attended to testatrix's business affairs; that he would be in and out everyday, at least once a day; that he would go in and out looking after the welfare of testatrix, as any devoted brother would look after his sister's business; that the degree of devotion she observed between Mr. Blackwell, his wife, and their boys towards the testatrix was that they considered her one of their family and that her welfare was their welfare; that she could not recall any particular expression testatrix made regarding any of the Blackwell family; that from her earliest recollection she knew and associated with testatrix and the Blackwell boys as her neighbors; that she played in the yard of the Blackwells and they played in her yard when they were children; that they were raised together like brothers and sister, and that, in a way, such relationship has continued down to the present time; that since she grew up she has continued her visits to the testatrix, as she was old and loved young people.

How could this neighbor of long standing become qualified to testify that Miss Bell loved the Blackwell boys as if they were her own children, if she was not qualified so to do from her, almost daily, association with the two families since her childhood? That she lived just across the street from both Miss Bell and the Blackwell family all her life, and had not only every opportunity to observe, but did in fact observe, the very close and cordial relation existing between Miss Bell and the Blackwell boys, is undisputed. It is shown that she had every opportunity which any one could have had, other than Miss Bell, herself, to determine whether Miss Bell loved the boys, unless it can be said that one who heard Miss Bell say she loved them, or some like expression, had superior knowledge of her feeling towards them. Should it be held that the only way one may judge that one person bears affection for another is to hear such person so state? Should it be held that one is unable to know as a fact that his wife, his children, his grandchildren, and his close friends love and esteem him, unless they tell him so by word of mouth? We think not. It may be very difficult, if practical at all, to give the reasons for knowing or believing that one with whom you have been closely associated for a long time is sane or insane, of sound mind or of unsound mind, just as it would be difficult to tell how a person's appearance indicates distress, mortification, or joy, or to tell how the person of a friend is recognized. Still, as said by Chief Justice Roberts, people are found to be in the daily habit of acting upon judgment so formed in important matters. Judgments so formed are grounds for an opinion, or conclusion, or judgment, which may be testified to in our courts. The court did not err in admitting the testimony complained of.

By the fourth assignment, practically the same complaint is made to admission of the testimony of Mrs. Seeligson as was made to the testimony of Miss Fey by the third assignment, and it is overruled for the same reasons given for overruling the third assignment.

[6] By the fifth, sixth, and seventh assignments, it is insisted that the case was to be submitted to the jury upon the sole special issue, upon request therefor by the parties, the court erred, first, in submitting the same by a general charge to which a single special issue was attached, to wit, whether or not testatrix was of sound mind at the time of the execution of the will, in that such submission failed to conform with the statute prescribing the method in which cases shall be submitted on special issues; and, second, in charging the jury that proponent, W. A. Blackwell, Sr., was seeking to have the will probated, and that J. R. Bell and W. A. Bell were opposing its probate on the grounds of mental incapacity of testatrix, in that such charge informed the jury of the effect that their answer to the special issue submitted would have upon the judgment of the court, and to that extent is violative of the law governing the submission of causes on special issues and in that it necessarily advised the jury the effect of their verdict.

We do not think any of the matters complained of in said assignments present reversible error. In the first place, there was but one issue to be presented, and no complaint is made of the form of the question submitting such issue. In the second place, the cause was not submitted on a general charge; and third, and last, if it be conceded, as we think it must be, that the explanation that Blackwell was offering the will for probate, and the Bells were opposing its probate on the grounds of mental incapacity of testatrix, was unnecessary, still we think that it was harmless, as under the circumstances it could not possibly have informed the jury of any fact they did not already know. No jury of common, ordinary intelligence could have heard the pleadings read and the evidence offered by counsel for the respective parties and have possibly remained ignorant of the fact that W. A. Blackwell was proposing the probate of the will and that the Bells were opposing its probate on the grounds of the mental incapacity of the testatrix.

[7] The court submitted to the jury the one issue, "Was Miss Sarah Jane Bell at the time she executed the will now offered for probate of sound mind?" And in connection with the submission of such issue charged the jury as follows:

"The burden of proof is upon the proponent, W. A. Blackwell, Sr., to show by a preponderance of the evidence that Miss Sarah Jane Bell was of sound mind at the time of the execution of the instrument offered for probate, that is, that she, Miss Sarah Jane Bell, had the capacity to know and understand what she was doing, and the effect of her act at the time she executed said instrument. If she had that capacity, her mind was sound; if she did not have it, her mind was unsound."

Contestants excepted to such charge, upon the ground that it did not define the term "sound mind" or "unsound mind" with sufficient particularity as to the elements constituting sound or unsound mind, and that such definition was too vague and general to advise the jury as to what constitutes the essential elements of soundness or unsoundness; the testatrix's ability or inability at the time of the execution of the will to comprehend the nature and extent of her estate, the objects of her bounty, and the business which she was about. And after such exception was taken, contestants requested the following special charge, which the court refused, to wit:

"You are instructed that by the term 'sound mind,' as used in the special issue submitted to you, is meant: Testatrix must have been capable of understanding the nature of the business she was engaged in, the nature and extent of her property, the persons to whom she might devise and bequeath it, and the mode of distribution among them; that she must have had memory sufficient to collect in her mind the elements of the business to be transacted, and to hold them long enough to perceive at least their obvious relations to each other and to be able to form a reasonable judgment as to them. And in answering this issue you will be guided by this definition."

By their ninth and tenth assignments appellants insist that the court erred in defining the meaning of the terms "sound mind" or "unsound mind" applicable to the present case, for reasons given in their exception to said charge, and in refusing to give their special requested charge, in that said special charge defined "mental soundness" and declared what constituted the elements thereof, and was necessary that the jury might determine whether or not the testatrix was of sound mind at the time of the execution of the will.

Assignments 9 and 10 are overruled.

We think the charge of the court, defining what would constitute "soundness of mind," as applicable to the present case, was sufficiently comprehensive and correct to avoid any necessity of reversing the judgment, upon the ground that it did not specifically include the matters set out in the requested charge, not included in said charge. Kell v. Ross (Tex. Civ. App.) 175 S. W. 752; Brown v. Mitchell, 75 Tex. 17, 12 S. W. 606; Houston v. Norton (Tex. Civ. App.) 264 S. W. 231; Whitney v. Murrie (Tex. Civ. App.) 264 S. W. 274; Salinas v. Garcia (Tex. Civ. App.) 135 S. W. 590; 26 R. C. L. p. 86, § 35.

The charge complained of is a copy of the charge given by the trial court in Kell v. Ross, which was upheld by the Fort Worth Court and approved by the Supreme Court by a refusal to grant a writ of error.

In Kell v. Ross (Tex. Civ. App.) 175 S. W. 752, the court said:

"The court gave the following charge, among others: 'The term "sound mind," as used in special issue No. 2, means that the said M. Kell at the time of the execution of said instrument had the capacity to know and understand what he was doing and the effect of his act at the time he executed said instrument.'

"To the definition of the term 'sound mind' so given appellants duly objected, because, as asserted, it failed to include the requirements that the testator must have had sufficient capacity 'to know the extent of his property and to know the natural objects of his bounty and the claims of the natural objects of his bounty.' In the effort to correct the defect claimed, appellants requested the submission of the following special instruction, which was refused: 'By "sound mind" is meant the ability to understand the business in which one is engaged, the effect of his acts, the capacity to know the objects of his bounty and their claims upon him, and the extent of his property.'

"Error is assigned to the rulings indicated."

The court then said that it thought that the definition given by the court was suffi-

ciently comprehensive and correct without the necessity of giving the requested charge.

We are advised by counsel for appellants in his brief, at page 22, that he thought that the charge given by the court in the present case, in legal effect, covered the substance of the requested charge, and in his argument he so stated to the jury.

In the section of Ruling Case Law, supra, it is said:

"Perhaps the shortest and most universal rule given for determining testamentary capacity is that the testator must be able to understand the business in which he is engaged when he makes his will, and to appreciate the effect of disposition made by him of his property."

And in Brown v. Mitchell, supra, Chief Justice Stayton, speaking for the Supreme Court, said:

"It may be doubted if charges enumerating so many things have a tendency to enable juries as clearly to understand their duties in such cases as would a simple charge to the effect that one had testamentary capacity if his mind and memory, at the time the paper was executed, were sufficiently sound to enable him to know and understand what he was doing and the effect of his act."

While the charge requested may have been upheld in some cases, and may be, and probably is, a correct charge in cases where the capabity of a testator to make a will is called in question, we find that the late opinions of our courts have approved the charge as given by the court in the present case, and we have been unable to find any case in which it has been held that such charge was insufficient or erroneous.

[8] We are now brought to a consideration of the last contention of appellant, in which it is said:

"In the course of the trial of the case, and in the argument to the jury on behalf of contestants, it was contended by counsel that before the jury could find that the testatrix was of sound mind, they must find that she was capable of understanding the nature of the business she was engaged in, the nature and extent of her property, the persons she might devise and bequeath it, and the mode of distribution among them; that she must have memory sufficient to collect in her mind the elements of the business to be transacted, and to hold them long enough to perceive at least their obvious relation to each other, and be able to form a reasonable judgment as to them, and that such was the legal effect of the court's charge.

"That Mr. A. C. Hartman, Esq., of counsel for proponent of the will, in his closing address, made use of the following argument to the jury: 'It is not necessary for the testatrix, at the time of the execution of the will, to comprehend the nature and extent of her estate, or the objects of her bounty, and the business that she was about, but all that was necessary was that she possess the capacity to know and understand what she is doing, and the ef-

fect of her act at the time she executed the instrument.' To such argument so made, contestants then and there objected, because the argument was misleading the jury as to the law of the case, and because it was not a correct statement of the necessary elements constituting the capacity required of one to execute a valid will. The court overruled the objection so made, and permitted counsel to continue such argument, which he continued as follows: 'It is not true, as argued by counsel for contestants, that she must have the mental capacity, at the time of the execution of the will, to comprehend the nature and extent of her estate, the objects of her bounty, and the business that she was about, and that if such had been the law Judge Green (the trial judge) would have so instructed the jury in his charge.'

"The contestants then further objected to said argument, because it expressly emphasized the error pointed out by contestants in their objection made originally to the court's charge, which objection and exception had been overruled by the court before the argument had begun in the case; but the trial court overruled all of said objections to said argument and permitted counsel to continue such argument of the case to the jury, to which action of the court contestants excepted."

The argument of counsel for appellant, the argument of counsel for appellee, the objection made to the later argument by counsel, and the fact that the court permitted such argument to remain with the jury, as stated by appellant, is shown by a bill of exception approved by the trial judge.

We think the argument was improperly made. While it was in one sense a reply to the argument of the counsel for appellant, it was nevertheless an incorrect statement of the law in the presence and hearing of the court and jury, which the court should have corrected. Counsel for appellants, as is shown by the bill of exception, argued to the jury that the charge of the court in its legal effect was to tell them that testatrix must have had the mental capacity, at the time of the execution of the will, to comprehend the nature and extent of her estate, the objects of her bounty, and the business that she was about, and that counsel for appellee made in argument the statement attributed to him in the bill of exception. While we have held that it was not necessary for the court in defining the term "sound mind" to go into such minute details as is embodied in the special requested charge, refused by the court, we are not to be understood as holding that it is not necessary that testatrix should have had the mental capacity at the time of the execution of the will to comprehend the nature and extent of her estate, the objects of her bounty, and the business that she was about; but what we do hold is that the legal effect of the charge given was to tell the jury that to enable testatrix to make a will she must have such mental capacity as contended for

by counsel of appellants. Indeed, counsel for appellants so construes such charge. Had the issue as to the mental capacity of testatrix been sharply contested, so that the argument complained of might have affected or changed the verdict of the jury, we would not hesitate to reverse the judgment; but we find no such condition.

Some 20 or more witnesses testified that they had known testatrix intimately for a long time, some of them for more than 30 years. They testified that they were her neighbors. Some of them testified that they had business transactions with her, and all of them testified that she was a woman of sound mind and of strong will power up to the date of her death. Dr. John W. Burns testified that he had lived in Cuero for 57 years; that he was a graduate physician and surgeon; that he knew Miss Bell nearly ever since he could remember and had been her family physician for 25 years; that he attended her in January, 1921, and in 1922; that she was a woman of strong character; that from his observation of and conversations with Miss Bell, he considered her a woman of sound mind; that he never noticed anything to indicate the contrary.

The evidence offered for the purpose of showing that Miss Bell was not of sound mind at the time of the execution of the will was so weak as to be of but little, if any, probative force.

The evidence, as we view it, is so overwhelmingly in favor of the sanity of Miss Bell, at the time of the execution of the will, as to render a finding to the contrary unsupportable by the evidence. A finding to the contrary would have been so against the overwhelming weight and preponderance of the evidence as to be clearly wrong, and in such case such finding could not be upheld by the court.

For the reasons expressed, we overrule all assignments of appellants and affirm the judgment.

Affirmed.